# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GABRIELA CARMONA and EDNA SEPULVEDA, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> SPANISH BROADCASTING SYSTEM, INC. and ALL STAR VACATION MARKETING GROUP, INC. <br><br> Defendants. | Civil Action No. 08-cv-4475 (LAK)/(GWG) |

## DEFENDANT SPANISH BROADCASTING SYSTEM, INC.'S NOTICE OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

PLEASE TAKE NOTICE that upon the attached memorandum of law, declaration of Frank Flores and attached exhibits, and pursuant to the Stipulation signed and entered on June 26, 2008 and Judge Lewis A. Kaplan's Motion Rules and Procedures, Defendant Spanish Broadcasting System, Inc. hereby moves this Court to dismiss plaintiffs' First Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) and for all other relief that the Court considers fair and equitable.

31375255

Dated:  July 3, 2008
      New York, NY

                                        KAYE SCHOLER LLP

                                        By_____/s_____
                                          Jacquelyn L. Sumer

Of Counsel

                                          425 Park Avenue
      William C. Zifchak                     New York, NY  10025
      Richard A. De Sevo                    Tel. (212) 836-8000
                                            Fax (212) 836-8689

                                        *Attorneys for Defendant*
                                          *Spanish Broadcasting System, Inc.*

**Index**

Exhibit 1 - Unreported Decision cited in the Memorandum of Law

Exhibit 2 - Amended Complaint

# EXHIBIT 1 TO NOTICE OF MOTION

LEXSEE



Cited
As of: Jul 02, 2008

## MEADOWLANDS INVESTMENTS, LLC, Plaintiff, -against- CIBC WORLD MARKETS CORP., et al., Defendants.

### 04 Civ. 7328 (DAB)

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

### 2005 U.S. Dist. LEXIS 21102

### September 22, 2005, Decided
### September 22, 2005, Filed

**DISPOSITION:** [*1] Defendant's Motion to Dismiss the claims against it GRANTED. Breach of contract claim and common law fraud claims against Defendant CIBC DISMISSED with prejudice. Plaintiff GRANTED leave to replead the New Jersey Consumer Fraud Act claim against Defendant CIBC with sufficient particularity as to each Defendant within thirty days of the date of this Order.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff property owner sued defendants, a commercial loan provider and others, alleging breach of contract, common law fraud, and a violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 et seq. Defendants moved to dismiss the complaint for failure to state a claim.

**OVERVIEW:** The breach of contract claim was dismissed because the factual allegations supported defendants' argument that it did consider plaintiff's loan application, as contemplated by an application letter, by retaining a law firm to conduct due diligence, maintaining frequent contact with plaintiff throughout the process, and continuously requesting information from plaintiff. Moreover, plaintiff's theory for the breach of contract claim, i.e., that defendants had to accept the loan application, was contradicted by the express terms of the application letter which gave plaintiff no right to a loan and stated that defendants were not obligated to make any loans unless certain conditions were met. The common law fraud claims were dismissed as plaintiff failed to adequately plead the elements of fraud, particularly justifiable reliance. The statutory claim was also dismissed as plaintiff had impermissibly clumped defendants together and failed to give any specific information about the allegedly false statements as required by Fed. R. Civ. P. 9(b). Plaintiff was granted leave to replead the statutory claim, but not the common law fraud and breach of contract claims.

**OUTCOME:** The motion to dismiss was granted. The breach of contract and common law fraud claims were dismissed with prejudice. Plaintiff was granted leave to replead the statutory claim.

**CORE TERMS:** loan application, lender, fraud claims, contract claim, breach of contract, good faith, refinance, Memorandum of Law, factual allegations, failure to state a claim, misrepresentation, particularity, diligence, conclusory allegations, leave to amend, leave to replead, pleading requirements, fraudulent, inducement, tenant, tort liability, false representations, bad faith, unconscionable, duplicative, obligated, deception, deposit, notice, futile

**LexisNexis(R) Headnotes**

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***

[HN1]In a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff. The district court should grant such a motion only if, after viewing the plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN2]For purposes of a motion to dismiss, a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the lawsuit.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN3]Fed. R. Civ. P. 8(a) sets forth a very liberal pleading standard.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
*Civil Procedure > Judgments > Relief From Judgment > General Overview*
[HN4]See Fed. R. Civ. P. 8(a).

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN5]The United States Court of Appeals for the Second Circuit has stated that conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.

*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements*
[HN6]The elements of actual fraud under New York law are false representation, scienter, materiality, expectation of reliance, justifiable reliance, and damage. Claims for fraudulent misrepresentation and fraudulent inducement must allege, inter alia, that the plaintiff reasonably relied on false representations made by the defendant.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
[HN7]See N.J. Stat. Ann. § 56:8-2.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Good Faith*
[HN8]The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 et seq., is worded in the disjunctive, and requires only that the plaintiff prove that the defendants committed one of the prohibited practices to sustain its claim. To state a claim under the Act, a plaintiff must allege (1) a violation of the Act, (2) that he or she suffered an ascertainable loss as a result of the unlawful conduct, and (3) a causal relationship between the unlawful practice and the loss sustained by the plaintiff. The United States Court of Appeals for the Third Circuit has found that "unconscionable commercial practice" "implies conduct that lacks good faith, honesty in fact, and observance of fair dealing. Reliance is not an element under the New Jersey Consumer Fraud Act.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN9]All elements under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 et seq., must comply with the particularity requirements of Fed. R. Civ. P. 9(b).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN10]When evaluating a claim of fraud, the court must first look to whether the claim has been pled sufficiently under Fed. R. Civ. P. 9(b). According to the United States Court of Appeals for the Second Circuit, the purpose of Rule 9(b) is threefold: (1) to put the defendant on notice of the details of the claims against him, (2) to protect a defendant's reputation and goodwill from unfounded allegations, and (3) to prevent strike suits. Rule 9(b) provides that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Therefore, a plaintiff pleading fraud must specify the statements it claims were false and misleading, give particulars as to the respect in which the plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. In cases where a plaintiff brings charges of fraud against multiple defendants, the Second Circuit requires the plaintiffs to

set forth separately the acts complained of by each defendant.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*

[HN11]It is clear that the pleading requirements of Fed. R. Civ. P. 8(a) are not replaced by those of Fed. R. Civ. P. 9(b). However, although Rule 9(b) must be read together with Fed. R. Civ. P. 8(a), which calls for a short and plain statement of a claim for relief, the specificity required by Fed. R. Civ. P. 9(b) is distinct from Fed. R. Civ. P. 8(a).

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*

[HN12]Fed. R. Civ. P. 15(a) requires that courts freely grant leave to amend when justice so requires. It is the usual practice upon granting a motion to dismiss to allow leave to replead. Absent a showing of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or the futility of the amendment, a plaintiff should be granted leave to replead.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*

[HN13]If an amendment would be futile, courts can deny leave to amend. A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

**COUNSEL:** For Meadowlands Investments, LLC, a New Jersey Limited Liability Company, Plaintiff: William I. Strasser, Strasser & Associates, Paramus, NJ.

For CIBC World Markets Corp., a Corporation of the State of Delaware, Defendant: Brendan Joseph Dowd, O'Melveny & Myers LLP, New York, NY.

For L.J. Melody & Company, a Texas Corporation, Defendant: John Richard Wenzke, Lampf, Lipkind, Prupis & Petigrow, New York, NY.

**JUDGES:** DEBORAH A. BATTS, United States District Judge.

**OPINION BY:** DEBORAH A. BATTS

**OPINION**

**MEMORANDUM & ORDER**

DEBORAH A. BATTS, United States District Judge.

Before the Court is Defendant CIBC World Markets Corp.'s ("CIBC") Motion to Dismiss the above action. Defendant CIBC moves to dismiss the breach of contract claim because Plaintiff's conclusory allegations of breach of contract are contradicted by the facts [*2] pleaded in the Complaint. Defendant CIBC also moves to dismiss the fraud claims for failure to state a claim pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, for failure to allege any exceptions to the rule that an alleged breach of contract does not give rise to tort liability, and for being duplicative. Plaintiff states that it has pleaded all claims sufficiently to meet the requirements set forth in the Federal Rules of Civil Procedure, and furthermore, that Defendant's Motion is premature as there has been no discovery in this matter.

For the reasons that follow, Defendant's Motion is GRANTED and the claims against Defendant CIBC are DISMISSED. Plaintiff is GRANTED leave to replead the New Jersey Consumer Fraud Act cause of action against Defendant CIBC.

**I. BACKGROUND**

Plaintiff Meadowlands Investments, LLC ("Meadowlands") is a New Jersey Limited Liability Company with offices in Paramus, New Jersey. Defendant CIBC is a corporation in the business of providing commercial loans. CIBC is incorporated in Delaware and its principal place of business is in New York. (Compl. PP1, 3.)

Plaintiff owns property located [*3] at 110 Meadowlands Parkway, Secaucus, New Jersey ("Secaucus Property"). In August, 2003, Plaintiff was allegedly approached by L.J. Melody & Company ("L.J. Melody"), a named defendant in this matter, [1] by its agent, James F. Gunning, Jr. ("Gunning"). Gunning suggested a possible refinance of Plaintiff's Secaucus Property. According to Plaintiff, L.J. Melody "was aware that a possible refinance of the property would be difficult based on the financial make-up and status of the telecommunications companies which were tenants in the building." (Id. P9.)

> 1  L.J. Melody is a New Jersey company engaged in the business of real estate and mortgage. It is incorporated under the laws of Texas and maintains its principal place of business in New York. (Compl. P4.) L.J. Melody submitted its Answer to the Complaint on November 19, 2004 instead of filing a Motion to Dismiss.

It may be appropriate for L.J. Melody to make a motion for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, based on the decision of the Court set forth in this Memorandum & Order. It is clear to the Court, however, that the defenses available to Defendant CIBC arising from the Application Letter of September 2, 2003 are not available to Defendant L.J. Melody.

[*4]  Defendant L.J. Melody, through Gunning, "advised" Plaintiff that "it had a lender that was ready, willing and able to refinance Plaintiff's property." (Id. P10.) That lender was Defendant CIBC. (Id. P11.) Defendants L.J. Melody and CIBC "advised" Plaintiff that CIBC would refinance the Secaucus Property for $ 9,750,000.00, with $ 750,000.00 of that sum to be held in an escrow account under the control of CIBC, subject to certain terms and conditions. L.J. Melody would receive a commission on the transaction. (Id. PP12-13.)

Plaintiff states that prior to applying for the refinancing loan, it "fully advised Defendants Melody and CIBC of the status of Plaintiff's current finances, as well as the current status of all leases and all other relevant information regarding the subject property." [2] (Id. P14.) L.J. Melody and CIBC were aware of the financial issues of the tenants of the Secaucus Property and had been advised by Plaintiff that one particular tenant, XO Communications, Inc. ("XO") was undergoing financial reorganization, and hence, it was not known whether XO would be renewing its lease which was set to expire on December 31, 2004. (Id. PP15-16.)

2  This is clearly disputed by Defendant CIBC, who claims that "Meadowlands is well aware that CIBC denied the application because Meadowlands and its representatives made numerous material misrepresentations and omissions in the application and due diligence process." (Def.'s Mem. of Law at 7, fn.2.) However, the Court will not consider this argument by Defendant since the Court must accept the Plaintiff's pleadings as true in a motion to dismiss.

[*5]  Both L.J. Melody and CIBC were fully aware of the financial condition of Plaintiff and its tenants at the Secaucus Property. (Id.) L.J. Melody, with this knowledge, "advised" Plaintiff that the refinance was a "done deal" and that "CIBC would process the loan expeditiously." (Id. P19.) Based on representations made by CIBC and L.J. Melody, Plaintiff began the loan application and submitted an Application Letter to CIBC on September 2, 2003 ("Application Letter"), along with a "Good Faith" application fee of $ 25,000.00. (Id. PP20-21.)

The Application Letter provides that CIBC "warrants and represents that it will act in Good Faith at all times in the processing of Applicant's Application." (Id. P22.) The Application Letter further provides that

Applicant understands and agrees that Lender is not obligated to make the Loans contemplated hereby unless and until (A) Lender has accepted this Application by obtaining Lender's Loan Committee approval and issuance of a separate commitment letter (the "Commitment"), (B) such Commitment is accepted by Applicant, and (C) the Closing Deposit to be paid by Applicant is paid. . . . Applicant acknowledges and agrees that . . . this [*6] Application is not an offer, a contract, a binder, a memorandum of contract, a commitment or a promise by Lender or CIBC World Markets to make the Loan, or an agreement to issue any such commitment. Lender may, at any time prior to the issuance of a Commitment, reject this Application and have no further obligations thereunder.

(Def.'s Notice of Motion at Ex. B, p.2.) In addition, the Application Letter states that "Any amounts remaining from the Good Faith Deposit after all Due Diligence Expenses and Legal Expenses have been paid shall be retained by Lender as a fee in consideration for its evaluation and processing of this Application." (Id, p.2-3.) The Application Letter is signed by Anil Bansal, "Managing Member" of Meadowlands, and dated September 2, 2003. (Id.)

Plaintiff began the due diligence process and complied with all the requirements of the Application. Plaintiff maintained constant contact with CIBC and CIBC's review counsel Winston & Strawn, LLP, in order to "assure that Plaintiff was in full compliance with CIBC's requirements." (Id. P24.) This constant contact with CIBC and CIBC's review counsel was "throughout the application process" and included communications [*7] via telephone, electronic mail, standard mail, overnight deliveries and facsimiles. (Id. P25.) According to Plaintiff, the correspondence was often "several times each day." Whenever CIBC requested additional documentation or information, Plaintiff provided it "immediately." (Id.) Plaintiff never withheld any information, nor delayed in providing the information; Defendant CIBC requested information continuously. On December 18, 2003, CIBC denied Plaintiff's application.

Plaintiff filed this action against Defendants CIBC, L.J. Melody, John Does 1-20, and ABC Corporation [3] on September 14, 2004. Plaintiff brings six claims against Defendant CIBC. Count One alleges fraudulent inducement to apply for the loan by Defendants CIBC and L.J. Melody. Count Two alleges that Defendant CIBC breached the express and implied contract between CIBC and Plaintiff. Count Three alleges violations by Defendants of regulations under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.* Count Four alleges common law fraud by Defendants, specifically that Defendants used deception and made false promises and representations to Plaintiff, which Plaintiff relied upon [*8]  in applying for the loan, and that Defendants then denied the application in bad faith and failed to return the deposit. Count Five also alleges false representations by Defendants upon which Plaintiff relied, reasonably believing those representations to be true and unaware of their falsity. Count Six again alleges fraud and false representations and inducements by Defendants as well as unconscionable commercial practice and deception, resulting in substantial economic damage to Plaintiff, who reasonably relying on Defendant's representations, made commitments to purchase additional property with the proceeds of the refinance loan, prior to the approval of the loan. (Id. PP30-68.)

     3    ABC Corporation is a fictitious name; the real name is unknown.

Defendant CIBC filed its Motion to Dismiss the Complaint on December 10, 2004.

## II. DISCUSSION

Defendant CIBC moves to dismiss the breach of contract claim for failure to state a claim because Plaintiff has made factual allegations that contradict its conclusory allegations [*9]  of breach of contract. Defendant CIBC also moves to dismiss the fraud claims for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), for failure to allege any exceptions to the rule that an alleged breach of contract does not give rise to tort liability, and because the fraud claims are duplicative.

In diversity cases, New York substantive law applies to claims arising out of common law and federal law governs procedural matters. See Kaufman v. Guest Capital, LLC, 386 F. Supp. 2d 256, 2005 U.S. Dist. LEXIS 1033, No. 03 Civ. 1509, 2005 WL 167602, at *6, fn.7 (S.D.N.Y. Jan. 25, 2005) (citing Hanna v. Plumer, 380 U.S. 460, 14 L. Ed. 2d 8, 85 S. Ct. 1136 (1986)); see also Philips Credit Corp. v. Regent Health Group, 953 F.Supp. 482, 501 (S.D.N.Y. 1997) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S.Ct. 817 (1938)); DeBruyne v. Clay, 1997 U.S. Dist. LEXIS

12224, No. 94 Civ. 4707, 1997 WL 471039, at *4 (S.D.N.Y. Aug. 18, 1997)) (same).

### A. Legal Standard for Motion to Dismiss

[HN1]In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the [*10]  Court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995) (citations omitted). "The district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999).

[HN2]For purposes of a motion to dismiss, a complaint is deemed to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the lawsuit." Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (citations omitted).

### B. Breach of Contract Claim

Defendant moves to dismiss Count Two of the Complaint for failure to state a claim for breach of contract.

Defendant argues that Plaintiff has failed to state a claim because Plaintiff has contradicted [*11]  the conclusory statements made in Count Two with its factual allegations, and that it has failed to meet Rule 8(a)'s liberal pleading standard by stating only legal conclusions, opinions or deductions and not facts. (Def.'s Mem. of Law at 6-7.)

[HN3]Rule 8(a) sets forth a very liberal pleading standard. Rule 8(a)(2) states that [HN4]"A pleading which sets forth a claim for relief . . . shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed. R. Civ. P. 8(a).

[HN5]The Second Circuit has stated, however, that "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) (quoting Gebhardt v. Allspect, Inc., 96 F.Supp. 2d 331, 333 (S.D.N.Y. 2000). See also Digests v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir. 1996), cert. denied, 519

U.S. 1007, 136 L. Ed. 2d 399, 117 S. Ct. 509 (1996) [*12] ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6).").

Defendant states that Plaintiff made the following factual allegations which plainly negate its breach of contract claim: (1) Meadowlands admitted that prior to submitting its Application Letter, it knew that a possible refinance would be difficult given the financial condition of its tenants at the Secaucus Property; (2) Plaintiff alleges that CIBC retained Winston & Strawn as its "review counsel" for the due diligence process; (3) Plaintiff characterizes the due diligence as extensive and states that it lasted for three months; (4) Plaintiff states that CIBC and Plaintiff maintained constant contact with Plaintiff throughout the application process, often corresponding "several times each day"; and (5) Plaintiff states that CIBC "continually requested" information from Meadowlands. (Def.'s Mem. of Law at 6-7.)

The Application Letter [4] specifically states that the Application Letter is "not an offer, a contract, a binder, a memorandum of contract of this Application." (Def.'s Notice of Motion at Ex. B, p.2.) However, it appears that Plaintiff [*13]  is not alleging that the denial of the loan application is a breach of contract, a claim presumably barred by the language of the Application Letter. Instead, it appears that the agreement Defendant CIBC allegedly breached is the failure by CIBC "to consider [the loan application] *as contemplated by the Loan Application.*" (Pl.'s Mem. of Law at 10.)

> [4]    As stated previously, the Court may consider documents incorporated into the Complaint by reference. The Application Letter is incorporated into the Complaint by various references Plaintiff makes to the Letter in the Complaint. (Compl. PP21-25.)

As Defendant points out, Plaintiff's factual allegations all support Defendant's argument that it did consider the loan application as contemplated by the Application Letter. Defendant retained a law firm to conduct due diligence, a process which took over three months. Defendant maintained frequent contact with Plaintiff throughout that period. Defendant also "continuously requested" information from Plaintiff.  [*14]   Plaintiff makes no allegation that Defendant tried to evade Plaintiff's communications in any way or acted in a manner, during the Application process, that constituted bad faith, aside from conclusory statements such as "the denial of Plaintiff's loan application was in bad faith." (Compl. P29.)

Plaintiff's allegations in the Complaint, which the Court must accept as true, demonstrate that Defendant

CIBC considered the loan application "as contemplated" in the Application Letter. What Plaintiff actually seems to be saying in its breach of contract claim is that considering the Application "as contemplated in the Loan Application" means more than good faith efforts by Defendant CIBC during the loan application process; instead, considering the Application "as contemplated" meant that CIBC had to accept Plaintiff's loan application. This is clearly contradicted by the express terms of the Application Letter which gave Plaintiff no rights to a loan and stated that the Lender (CIBC) was not obligated to make any loans unless certain conditions were met.

The Court finds that Plaintiff has asserted factual allegations that undermine any claim that Defendant breached any agreement  [*15]   "to consider Plaintiff's application for the Loan as contemplated in the Loan Application." In fact, Plaintiff, in the Complaint, has laid out many facts to support the position that Defendant was quite diligent in its process of considering the Application. The assertions contained in Count Two, when read in conjunction with the factual allegations in the Complaint, are merely legal conclusions and conclusory allegations. Thus Count Two does not meet the liberal pleading requirements of Rule 8(a).

Accordingly, the Court Defendant's Motion to Dismiss Count Two of the Complaint is GRANTED.

## C. Fraud Claims

Defendant moves to dismiss the five claims alleging fraud by Defendant CIBC for failure to state a claim, failure to plead fraud with particularity, failure to satisfy the requirements for group pleading, failure to allege any extra-contractual representation as a basis for the fraud claim, and for being duplicative.

### 1. Counts One, Four, Five and Six

Defendant argues that Count One, alleging fraud in the inducement, [5] must be dismissed because it fails to meet the particularity requirement of Rule 9(b), fails to allege scienter, and fails to allege any of the exceptions to [*16]   the rule that an alleged breach of contract does not give rise to tort liability. (Def.'s Mem. of Law at 8.) Defendant also argues that Counts Four, Five and Six must be dismissed for failure to state a claim for fraud and because they are duplicative of the other fraud claims.

> [5]    Defendant states that Plaintiff "fails to articulate a legal theory" in Count One," but that it appears that Plaintiff is "trying to allege a claim for fraud-in-the-inducement." (Def.'s Mem. of Law at 8.) The Court also could not discern a legal theory in Count One. However, in its response, Plaintiff states that Defendant's assess-

ment is correct and that Count One charges Defendant with fraud in the inducement.

[HN6]"The elements of actual fraud under New York law are false representation, scienter, materiality, expectation of reliance, justifiable reliance, and damage." Congress Fin. Corp. v. John Morrell & Co., 790 F.Supp. 459, 469 (S.D.N.Y. 1992) (citing Morse/Diesel, Inc. v. Fidelity And Deposit Co. of Md., 715 F.Supp. 578, 585 (S.D.N.Y. 1989)). [*17] Claims for fraudulent misrepresentation and fraudulent inducement "must allege, inter alia, that [Plaintiff] reasonably relied on false representations made by [Defendant]." Fax Telecommunicaciones, Inc. v. AT&T, 138 F.3d 479, 490 (2d Cir. 1998) (citations omitted).

Plaintiff, through its Managing Member, Anil Bansal, signed the Application Letter which specifically stated that "this Application is not an offer, a contract, a binder, a memorandum of contract, a commitment or a promise by Lender or CIBC world Markets to make the Loan, . . . . Lender may, at any time prior to the issuance of a Commitment, reject this Application and have no further obligations thereunder." (Def.'s Notice of Motion at Ex. B, p.2.)

Reading the Complaint in the light most favorable to Plaintiff, Plaintiff has failed to plead adequately the elements of fraud, particularly justifiable reliance. In addition to Plaintiff's failure to allege any specific information about any misrepresentations as required by Rule 9(b), Plaintiff signed the Application Letter that stated that Defendant CIBC was not obligated to approve the loan application. Plaintiff could not have reasonably relied upon [*18] any representations made by Defendant CIBC that the loan application would be approved when the Application Letter clearly provides that Defendant CIBC is not at all obligated to approve the application.

Therefore, because Plaintiff has failed to plead adequately justifiable reliance, and could not in any circumstance, Defendant's Motion to Dismiss Counts One, Four, Five and Six of the Complaint is GRANTED. [6]

> 6    Because the Court has found that Plaintiff has failed to state a claim for fraud in Counts One, Four, Five and Six, the Court will not address Defendant's last argument that Plaintiff failed to allege any exceptions to the rule that a claim for breach of contract does not give rise to tort liability.

2. New Jersey Consumer Fraud Act

Defendant seeks to dismiss Count Three of the Complaint, which alleges violations of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, et seq.

Plaintiff does not rely on any specific provision of the New Jersey Consumer Fraud Act but alleges [*19] that Defendants L.J. Melody and CIBC used "unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentation to induce Plaintiff to apply for the Loan" and that Defendants "knowingly concealed, suppressed and omitted material facts." (Compl. PP47-48.) Specifically, Plaintiff claims that Defendants violated the New Jersey Consumer Fraud Act by:

> a. Offering Plaintiff the ability to consider a loan with predetermined terms and conditions.

> b. Inducing Plaintiff to apply for the Loan by implying that Plaintiff's risk of loss would be limited by stating that CIBC, "warrants and represents that it will act in Good Faith at all times in the processing of Applicant's Application."

> c. Denying Plaintiff's application in bad faith.

> d. Failing to return Plaintiff's Good Faith Deposit as required by the contract.

(Id. P49.)

According to the New Jersey Consumer Fraud Act, a practice is unlawful under the act if

> [HN7]The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of [*20] any material fact with intent that others rely upon such concealment, suppression or omission, . . . whether or not any person has in fact been misled, deceived or damaged thereby, . . . .

N.J. Stat. § 56:8-2. [HN8]"The Act is worded in the disjunctive, and requires only that [Plaintiff] prove that defendants committed one of the prohibited practices to sustain its claim." Naporano Iron & Metal Co. v. American Crane Corp., 79 F.Supp. 2d 494, 507 (D. N.J. 1999). To state a claim under the Act, a plaintiff must allege (1) a violation of the Act, (2) that he or she suffered an ascertainable loss as a result of the unlawful conduct, and (3) a causal relationship between the unlawful practice and the loss sustained by plaintiff. See Szczubelek v.

Cendant Mortg. Corp., 215 F.R.D. 107, 122 (D. N.J. 2002). The Third Circuit has found that "unconscionable commercial practice" "implies conduct that lacks good faith, honesty in fact, and observance of fair dealing." Green v. Am. Online (AOL), 318 F.3d 465, 473 (3d Cir. 2003) (citation and internal quotations omitted). Reliance is not an element under the New Jersey Consumer Fraud Act. [*21] See Morgan v. Markerdowne Corp., 201 F.R.D. 341, 350 (D. N.J. 2001).

[HN9]All elements under the New Jersey Consumer Fraud Act must comply with the particularity requirements of Fed. R. Civ. P. 9(b). See Lewis Tree Service, Inc. v. Lucent Technologies, Inc., 2000 U.S. Dist. LEXIS 12922, No. 99 Civ. 8556, 2000 WL 1277303, at *4 (S.D.N.Y. 2000) (citing Zaro Licensing, Inc. v. Cinmar, Inc., 779 F.Supp. 276, 286 (S.D.N.Y. 1991)).

[HN10]When evaluating a claim of fraud, the Court must first look to whether the claim has been pled sufficiently under Fed. R. Civ. P. 9(b). [7] According to the Second Circuit, the purpose of Rule 9(b) is threefold: (1) to put the defendant on notice of the details of the claims against him, (2) to protect a defendant's reputation and goodwill from unfounded allegations, and (3) to prevent strike suits. See Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004) (citation and internal quotations omitted); Maywalt v. Parker & Parsley Petroleum Co., 808 F. Supp. 1037, 1046 (S.D.N.Y. 1992). Rule 9(b) provides: "in all averments of fraud or mistake, the circumstances [*22] constituting fraud or mistake shall be stated with particularity. . . ." Fed. R. Civ. P. 9(b). Therefore, a plaintiff pleading fraud must "specify the statements it claims were false and misleading, give particulars as to the respect in which Plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)). In cases where a plaintiff brings charges of fraud against multiple defendants, the Second Circuit has required plaintiffs to "set[] forth separately the acts complained of by each defendant." Double Alpha, Inc. v. Mako Partners, L.P., 2000 U.S. Dist. LEXIS 10454, No. 99 Civ. 11541, 2000 WL 1036034, at *3 (S.D.N.Y. July 27, 2000) (internal quotations omitted).

7    A review of Plaintiff's Memorandum of Law demonstrates a fundamental misunderstanding by Plaintiff of the pleading requirements for counts alleging fraud. Plaintiff refers to Rule 9(b) only once, on page 15: "Thus, once again the pleadings contained in Plaintiff's Complaint are more than sufficient to satisfy the liberal pleading requirements of Rules 12(b)(6) and 8(a)(2), as well

as the pleading requirements contained in Rule 9(b) requiring particularity of fraud pleadings." Aside from this glancing reference, Plaintiff argues that the fraud claims should not be dismissed because they comply with the pleading requirements of Rules 12(b)(6) and 8(a)(2).

[HN11]It is clear that the pleading requirements of Rule 8(a) are not replaced by those of Rule 9(b). However, although "Rule 9(b) must be read together with Rule 8(a), which calls for a 'short and plain statement' of a claim for relief," DiVittorio v. Equidyne Extractive Indus., 822 F.2d 1242, 1247 (2d Cir. 1987), "the specificity required by Rule 9(b) is distinct from Rule 8(a) . . ." IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1057 (2d Cir. 1993).

[*23]    Plaintiff has failed to plead adequately the elements of fraud in Count One. Plaintiff alleges that Defendants made certain representations which Plaintiff relied upon when applying for the loan, including "advising" Plaintiff that CIBC would refinance the Secaucus Property (Compl. P12), and other representations, "both explicit and implied." (Id. P33.) However, Plaintiff impermissibly clumps Defendants together and also fails to give any specific information about the allegedly false statements as required by Rule 9(b), such as when and where the statements were made, identifying the speaker responsible for those statements more specifically than a general identification of the speaker as "Defendants," and giving particulars about why the statements were fraudulent when made. See Suez Equity Investors, 250 F.3d at 95.

Accordingly, Defendant's Motion to Dismiss Count Three is GRANTED. [8]

8    Defendant CIBC also argues that Count Three should be dismissed because a breach of contract claim does not give rise to a Consumer Fraud claim. However, Defendant CIBC appears to misapprehend the basis for Count Three. In Count Three, Plaintiff is not arguing, as it did in Count Two, that Defendant CIBC did not process the loan application in good faith; Plaintiff asserts that Defendant CIBC made false misrepresentations to Plaintiff that the loan application would be approved. (Compl. P12.)

[*24]    D. Leave to Replead

[HN12]Rule 15(a) of the Federal Rules of Civil Procedure requires that courts freely grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a). "It is the usual practice upon granting a motion to dismiss to allow leave to replead." Cohen v. Citibank, 1997

U.S. Dist. LEXIS 2112, No. 95 Civ. 4826, 1997 WL 88378, at *2 (S.D.N.Y. Feb. 28, 1997). Absent a showing of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or the futility of the amendment, a plaintiff should be granted leave to replead. See Protter v. Nathan's Famous Sys., Inc., 904 F.Supp. 101, 111 (E.D.N.Y. 1995) (citing Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)).

However, [HN13]if an amendment would be futile, courts can deny leave to amend. See Oneida Indian Nation of N.Y. v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003) (citing Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Id. [*25] (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

Plaintiff cannot allege any basis for a breach of contract claim based on the alleged failure to consider the Application "as contemplated" in the Application Letter, when Plaintiff has stated facts that show that Defendant met all of its obligations in evaluating the loan application. The Court finds that any amendment would be futile and therefore denies Plaintiff leave to amend the Complaint with respect to the breach of contract claim.

The facts pleaded in the Complaint also demonstrate that Plaintiff cannot sufficiently allege claims of com-mon law fraud. Hence, the Court also finds that granting Plaintiff leave to replead the fraud claims against Defendant CIBC would futile. Plaintiff is denied leave to amend the Complaint with respect to the common law fraud claims. However, because reliance is not required to plead a violation of the New Jersey Consumer Fraud Act, Plaintiff is GRANTED leave to amend the New Jersey Consumer Fraud claim against Defendant CIBC.

III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss the claims against it is GRANTED.

The breach of [*26] contract claim and common law fraud claims against Defendant CIBC are DIS-MISSED with prejudice. Plaintiff is GRANTED leave to replead the New Jersey Consumer Fraud Act claim against Defendant CIBC with sufficient particularity as to each Defendant within thirty days of the date of this Order.

SO ORDERED.

Dated: New York, New York

September 22, 2005

DEBORAH A. BATTS

United States District Judge

LEXSEE



Cited
As of: Jul 02, 2008

**NEW YORK ELECTROLYSIS ASSOCIATION, INC., HAIR GOES, INC. and
VIRGINIA BARR, all Individually and as Representatives of a Class, Plaintiffs, v.
BELL ATLANTIC YELLOW PAGES COMPANY - NEW YORK and STEVEN
YARINSKY, M.D., Individually and d/b/a "A", Defendants.**

**RJI No. 45-1-2000-0960, Index No. 2000-1344**

**SUPREME COURT OF NEW YORK, SARATOGA COUNTY**

**2000 N.Y. Misc. LEXIS 534**

**December 11, 2000, Decided**

**NOTICE:**

[*1]    THE LEXIS PAGINATION OF THIS
DOCUMENT IS SUBJECT TO CHANGE PENDING
RELEASE OF THE FINAL PUBLISHED VERSION.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs sued defendants
for breach of contract and violation of N.Y. Gen. Bus.
Law § 349. Plaintiffs moved for an order, under N.Y.
C.P.L.R. 902, certifying that their action proceed as a
class action. Defendant yellow page company moved to
dismiss the complaint.

**OVERVIEW:** Plaintiffs represented the electrolysis
industry, an electrolysis business, and an electrologist
who owned the business. They sued defendants yellow
pages company and cosmetic surgeon, claiming that de-
fendant yellow page company improperly included tele-
phone listings and advertisements from practitioners of
laser hair removal in the section of its commercial "yel-
low pages" directory titled "Electrolysis." They alleged
breach of contract and violation of N.Y. Gen. Bus. Law §
349. The court dismissed the action as against defendant
yellow pages company because the contract with plaintiff
business allowed defendant yellow pages company the
freedom to determine the headings of classes of adver-
tisements and to place specific advertisers under specific
headings in the exercise of its discretion. Further, the

yellow pages fell within the categorized exemption con-
tained in N.Y. Gen. Bus. Law § 349(e).

**OUTCOME:** The motion to dismiss was granted, and
the complaint against defendant yellow page company
was dismissed. The motion to certify the action as a class
action was rendered moot by the dismissal of the com-
plaint as against defendant yellow page company.

**CORE TERMS:** hair, advertisement, electrolysis, re-
moval, causes of action, directory, listing, laser, practi-
tioners, yellow pages, telephone, heading, class action,
deceptive, exemption, cosmetic, breached, consumer,
surgeon, pleader, responsive pleading, proffered, modal-
ity, certify

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Motions to Dismiss*
[HN1]In considering a dismissal motion made before
issue is joined, the court must take the allegations in the
complaint as true and resolve all inferences which rea-
sonably flow therefrom in favor of the pleader. The dis-
positive inquiry is whether the proponent of the pleading
has a cause of action, not whether he has stated one. In
opposition to the motion, the pleader is allowed to sub-
mit affidavits to remedy defects in the complaint and
preserve inartfully pleaded, but potentially meritorious
claims.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > State Regulation*
*Antitrust & Trade Law > Trade Practices & Unfair Competition > State Regulation > Coverage*

[HN2]N.Y. Gen. Bus. Law § 349 is a broad consumer protection measure which declares deceptive actions or practices of any trade, business, or commerce, or in the furnishing of any service to be unlawful. Section 349, despite its expansive reach to virtually all economic activity includes a categorized exemption in subdivision (e) in favor of any publisher or printer of a newspaper, magazine, or other form of printed advertising who publishes or prints the advertisement. N.Y. Gen. Bus. Law § 349(e).

**COUNSEL:** LAW OFFICE OF THOMAS MILLER, Saratoga Springs, New York, Attorney for Plaintiffs.

RICHARD H. WAGNER, New York, New York, Attorney for Defendant Bell Atlantic.

HISCOCK & BARCLAY LLP, Albany, New York, Attorneys for Defendant Bell Atlantic.

VAL M. SERBALIK, Mechanicville, New York, Attorney for Defendant Yarinsky.

**JUDGES:** PRESENT: HON. THOMAS D. NOLAN, JR., Supreme Court Justice.

**OPINION BY:** THOMAS D. NOLAN, JR.

**OPINION**

*DECISION AND ORDER*

This action has its genesis in a conflict between "electrolysis" [1] practitioners and physicians, principally cosmetic surgeons and dermatologists, who perform hair removal by using lasers. [2] Plaintiffs, a trade association representing the electrolysis industry in New York State, an individual practitioner of electrolysis business, and an electrologist, who owns the named business and is president of the trade association, sue Bell Atlantic Yellow Pages - New York (Bell) and Steven Yarinsky, M.D., a cosmetic surgeon, alleging breach of contract and the violation of General Business Law § 349. The gravamen of the action is [*2] that Bell improperly, inappropriately and wrongly includes telephone listings and advertisements from practitioners of laser hair removal in the section of its commercial "yellow pages" directory titled "Electrolysis". Plaintiff Hair Goes, Inc. has an advertisement and listing in that section of the directory released in the Albany-Capital District region and claims that defendant

Bell has breached the contract it made by inserting in that section an advertisement and listing of defendant Yarinsky, which promotes a toll-free telephone number whereby information about "permanent hair removal procedures" can be obtained. Plaintiffs further contend that the subject listing and advertisement of Yarinsky is deceptive, misleading and injurious to consumers and thus violates General Business Law § 349.

> 1    "Electrolysis" is a modality of treatment whereby a "needle-type epilator" is utilized to destroy the roots of unwanted hair (plaintiffs' complaint - par 11).
> 2    "Laser Hair Removal" is a modality of treatment whereby light from a medical laser is absorbed by the skin and converted to heat impairing the process of hair growth (plaintiffs' complaint - par 12).

[*3] Defendant Bell, prior to answer, moves to dismiss the complaint asserting that it falls to state causes of action and that in addition the first cause of action is barred by documentary evidence, namely the contract between Bell and plaintiff Hair Goes, Inc.

Plaintiffs move for an order, pursuant to CPLR 902, certifying that the action proceed as a class action.

[HN1]In considering a dismissal motion made before issue is joined, the court "must take the allegations [in the complaint] as true and resolve all inferences which reasonably flow therefrom in favor of the pleader". *Cron v Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 670 N.Y.S.2d 973, 694 N.E.2d 56 (1998). The dispositive inquiry is "whether the proponent of the pleading has a cause of action, not whether he has stated one *Guggenheimer v Ginzburg*, 43 N.Y.2d 268, 275, 401 N.Y.S.2d 182, 372 N.E.2d 17 (1997). In opposition to the motion, the pleader is allowed to submit affidavits "to remedy defects in the complaint" and "preserve inartfully pleaded, but potentially meritorious claims". *Rovello v Orofino Realty Co.* 40 N.Y.2d 633, 635-636, 389 N.Y.S.2d 314, 357 N.E.2d 970 (1976). [*4]

In this case, plaintiffs' complaint does not incorporate a copy of the contract between Bell and plaintiff Hair Goes, Inc., but defendant Bell cures the problem by including a copy as part of the motion. Despite plaintiffs' arguments and explanations of conflict between competing groups of hair removal practitioners, the contract, which Bell proffered and defendant Hair Goes, Inc. accepted, allows Bell the freedom to determine the headings of classes of advertisements and to place specific advertisers under specific headings in the exercise of its discretion. The contract does not include a promise that "laser hair removal" practitioners will not be listed under the "electrolysis" heading. The 1997 internal memoran-

dum of Bell's marketing department, proffered by plaintiffs to support the validity of their claim, cannot be used to modify the contract to add a term which was not expressly included. The parol evidence rules bars the introduction of such extrinsic evidence. Defendant Bell published plaintiff's Hair Goes, Inc.'s advertisement and listing in the directory as it promised to do. The contract was not breached by the inclusion of defendant Yarinsky's advertisement in the same [*5]   section of the directory.

Plaintiffs' first cause of action is accordingly dismissed without costs.

[HN2]General Business Law § 349 is a broad consumer protection measure which declares deceptive actions or practices of any trade, business or commerce, or in the furnishing of any service to be unlawful. *see generally, Stutman v Chemical Bank Inc., 95 N.Y.2d 24, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000)*. Section 349, despite its expansive reach "to virtually all economic activity" includes a "categorized exemption" in subdivision (e) in favor of "any publisher or printer of a newspaper, magazine, or other form of printed advertising who...publishes, or prints the advertisement". *Karlin v IVF America, Inc., 93 N.Y.2d 282, 290, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999)*. The yellow pages section of

the telephone directory, at the heart of this controversy, falls within the exemption.

Plaintiffs' second cause of action fails as a matter of law and is accordingly dismissed against defendant Bell without costs.

Plaintiffs' motion to certify this action as a class action is rendered moot by the dismissal of the complaint as against defendant Bell and is accordingly [*6]   denied without costs. The motion to certify was also premature as it was made before defendant Bell's time to serve a responsive pleading ran. Such denial is without prejudice to renewal once defendant Yarinsky's time to serve a responsive pleading expires.

This decision constitutes the order of the court.

The original hereof together with all original papers are returned to defendant Bell's attorneys for entry.

So ordered.

DATED: December 11, 2000

Ballston Spa, New York

HON. THOMAS D. NOLAN, JR.

Supreme Court Justice

Not Reported in Cal.Rptr.3d                                                    Page 1
Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.))**

Park v. Korea Radio USA, Inc.
Cal.App. 2 Dist.,2007.
Only the Westlaw citation is currently available.

California Rules of Court, rule 8.1115, restricts
citation of unpublished opinions in California
courts.

Court of Appeal, Second District, Division 4, California.
Benjamin PARK, et al., Plaintiffs and Appellants,
v.
KOREA RADIO USA, INC., et al., Defendants and
Respondents.
No. B194433.
(Los Angeles County Super. Ct. No. BC347173).

Nov. 14, 2007.

APPEAL from a judgment of the Superior Court of
Los Angeles County, Kenneth R. Freeman, Judge.
Affirmed.

Sullivan, Workman & Dee, Joseph S. Dzida and
Theodore S. Khachaturian for Plaintiffs and Appellants.
Sedgwick, Detert, Moran & Arnold, Joseph Kouri
and Michele L. Flowers for Defendant and Respondent Korea Radio USA, Inc.
Mitchell Silberberg & Knupp, Eric J. German,
Daniel M. Hayes and James I. Bang for Defendant
and Respondent Radio Seoul.WILLHITE, Acting
P.J.

**INTRODUCTION**

*1 Plaintiffs gave money to two investment companies but the companies misappropriated the funds
for their own use.[FN1] Plaintiffs, in addition to suing
the companies and their principals, sued the two radio stations on which the companies had investment
programs. Insofar as is relevant to this appeal,
plaintiffs alleged that the radio stations negligently
endorsed and promoted the companies as qualified

and expert investment counselors and, in reasonable
and foreseeable reliance upon those representations,
plaintiffs invested, only to lose their money through
the companies' defalcation. The radio stations demurred. The trial court held that as a matter of law
plaintiffs' first amended complaint failed to establish that the stations owed them any duty. The trial
court therefore sustained the demurrers without
leave to amend and dismissed the complaint as to
those two defendants. Plaintiffs' appeal challenges
that ruling. We affirm.

> FN1. Plaintiffs are: Benjamin Park, John
> Kim, Sung Kyu Kim, David Kinam Kim,
> Eunice Park, Hong E. Jung, Hwa Soon
> Choi, Haeyong Richard Ro, Henry Chung
> and Samuel B. Suh.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Complaint*

Plaintiffs' initial complaint alleged one negligence
cause of action against the two defendants involved
in this appeal, Radio Seoul and Radio Korea. In addition, plaintiffs sued the two hosts of the investments shows and their companies (collectively the
hosts).[FN2] The complaint alleged defendants gave
the hosts "free radio time during prime commuting
hours ... to host a show on stocks, investments and
financial planning, and to promote [the hosts' companies]." Defendants allegedly "negligently endorsed and promoted" the hosts "as qualified and
expert investment advisors" without investigating
whether they were, in fact, qualified and licensed.
After hearing the programs on defendants' stations,
plaintiffs were "induced" to invest with the hosts.
Plaintiffs further averred that defendants negligently failed to investigate whether the hosts invested plaintiffs' funds as represented.

> FN2. Radio Korea hired Hyun Soo Jang
> and Radio Seoul hired Kang Sang Kim.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.))**

The two men are the sole stockholders in Unus Capital Management, Inc., an entity which surrendered its investment adviser's license in November 2004. Jang is the principal stockholder in Peoplen Investment, Corp., an unlicensed entity. The order under review does not involve the plaintiffs' action against the two men or the corporate entities.

The trial court sustained a demurrer to the complaint with leave to amend. At the hearing, the trial court indicated that one deficiency in the complaint was its conclusory allegation that defendants had endorsed and promoted the hosts. In particular, the court, after discussing applicable precedent, noted that plaintiffs had failed to allege "some sort of action by the [defendants] that indicates that they have investigated this and certify it one way or another as being a valid investment firm." As for the allegation that defendants had failed to monitor whether the hosts had properly invested plaintiffs' funds, the court pointed out that plaintiffs had "not cited any authority that would suggest that such a duty exists."

2. *The First Amended Complaint*

The first amended complaint deleted the negligence cause of action and substituted in its place causes of action for negligent undertaking, negligent endorsement, and negligent misrepresentation. The gist of the allegations remained the same. Plaintiffs alleged that defendants operated radio stations in Los Angeles directed to the Korean community. To attract new listeners, each decided to broadcast a program in Korean providing financial and investment advice to its listeners. To that end, each engaged an individual to host a program. According to plaintiffs' complaint, the programs were actually "paid advertisements," a fact defendants never disclosed to their listeners.[FN3]

FN3. Plaintiffs' allegation that the shows were "paid advertisements" is inconsistent with their allegation that the defendant radio stations gave the hosts "free air time." None of the parties addresses this inconsistency. Resolution of the inconsistency is irrelevant to disposition of this appeal.

**\*2** During the programs, the hosts dispensed financial advice, answered individual questions from listeners, and solicited clients for their companies. As a result, plaintiffs invested money with the hosts. However, plaintiffs lost their money because "[i]nstead of investing funds given to them by plaintiffs as they had represented, [the hosts] misappropriated these funds and expended them for their own purposes."

The complaint alleged that defendants promoted, represented, and endorsed the hosts "as licensed experts in the fields of financial planning and investment advice" and that defendants "knew or should have known that listeners including plaintiffs would believe that the stations were vouching for the ability, honesty and expertise" of the hosts. In particular, the stations allegedly knew that listeners "in the Korean community would rely heavily on the fact that the radio stations had selected [the] hosts for these programs and were vouching for their ability, honesty and expertise."

Plaintiffs' cause of action for negligent undertaking alleged that a duty of care arose because defendants "voluntarily undertook" to produce and air the programs and "to promote and endorse" the hosts as licensed experts. According to plaintiffs, "[a]s part of this undertaking, the two stations voluntarily produced and created content for the programs, and provided employees to play roles (as if they were ordinary consumers) during the programs and provide voice over and voice commentary during the programs." Plaintiffs further averred that when listeners, including themselves, called the radio station to ask questions and to obtain financial advice, defendants "refer[ed] them to the host defendants and their companies, without any disclaimer of responsibility." Defendants allegedly breached their duty to exercise due care by failing to investigate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                    Page 3
Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.))**

whether the hosts were licensed, by failing to determine if the hosts were investing plaintiffs' funds as represented, and by failing to warn listeners that defendants took no responsibility for the hosts' actions.

Plaintiffs' cause of action for negligent endorsement alleged that "[i]mplicit in the actions, representations and undertakings [of the radio station defendants] was the representation that these two stations had each taken reasonable steps to make an independent, adequate and competent investigation and examination of the background, qualifications, license status and performance of the host defendants and their companies, that they were satisfied by that investigation, and that the host defendants and their companies were suitable places for listeners including plaintiffs, to invest their money."According to plaintiffs, defendants "chose not to investigate."

Plaintiffs' cause of action for negligent misrepresentation incorporated the allegations of the prior two causes of action and averred that defendants "made the representations (express and implied) ... negligently and without any reasonable ground for believing them to be true."These included the express representations that the hosts were qualified, licensed and honest expert financial advisers and the implied representations that defendants had conducted independent investigations to satisfy themselves that the hosts were as represented.

**\*3** Common to all causes of action was the allegation that defendant radio stations "are the dominant media" and "have extraordinary influence" in the Korean community. Consequently, plaintiffs averred that they reasonably and foreseeably relied upon defendants' endorsement and promotion of the hosts when they invested money with the hosts, money which the hosts wrongfully misappropriated.

At the hearing conducted on the demurrers to this pleading, the trial court stated that plaintiffs had not "alleged sufficient facts" "to overcome the defects initially found. The defects have not been cured."Plaintiffs did not request leave to file anoth-

er amended pleading. The trial court sustained the demurrer without leave to amend and dismissed the action as to these defendants. This appeal follows.

### DISCUSSION

"When, as in this case, the ultimate object of our review is the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. We accept as true 'all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.'[Citation.]" (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1040.)

Each of plaintiffs' causes of action sounds in negligence. The predicate of any negligence claim is that the defendant owes a duty to the plaintiff. Whether a duty of due care exists in a particular case is a question of law. (*Yanase v. Automobile Club of So. Cal.* (1989) 212 Cal.App.3d 468, 473 and authorities cited therein.) Hence, regardless of how plaintiffs' negligence claim is characterized, the overarching question is whether defendants, as radio stations which broadcast the hosts' programs, owed a duty to plaintiffs.

To answer that question, we begin with the cases which held that a publisher is not liable for simply failing to investigate an advertiser's product or claim or to warn of potentially false advertising. *Walters v. Seventeen Magazine* (1987) 195 Cal.App.3d 1119(*Walters* ) is particularly analogous to this case because it, too, involved a claim of an "implied" endorsement. There, a teenage plaintiff sued Seventeen magazine for personal injuries sustained through use of a tampon advertised in the publication. Relying upon theories of negligence and false advertising, she alleged that the placement of the advertisement among articles about teenage health misled her (and the magazine's other youthful readers) into believing the magazine had endorsed the product. In addition, she averred that by the time the ads were run, the publisher knew about the dangers of the product. The trial court sustained a demurrer without leave to amend

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.))**

and dismissed the lawsuit.

The appellate court affirmed. It distinguished the case from *Hanberry v. Hearst Corp.* (1969) 276 Cal.App.2d 680(*Hanberry* ), (which we discuss, *infra* ) finding that the publisher had in no manner sponsored or endorsed the product. It explained: "There was no representation of quality, no promotional effort, and no attempt to induce the public to buy [the product] beyond merely printing the advertisement."(*Walters, supra,* 195 Cal.App.3d at p. 1122.) It characterized the plaintiff's argument that ad placement created the impression of product endorsement as "utterly devoid of support in the record, and in any event ... meaningless by itself."(*Ibid.*) The court concluded that sound public policy considerations militated against creation of "a new tort of negligently failing to investigate the safety of an advertised product. Such a tort would require publications to maintain huge staffs scrutinizing and testing each product offered. The enormous cost of such groups, along with skyrocketing insurance rates, would deter many magazines from accepting advertising, hastening their demise from lack of revenue. Others would comply, but raise their prices beyond the reach of the average reader. Still others would be wiped out by tort judgments, never to revive. Soon the total number of publications in circulation would drop dramatically. [¶] Perhaps this dire possibility is one reason the United States Supreme Court has been so vigilant about linking commercial speech to the First Amendment. [Citations.]"(*Ibid.*)

**\*4** The next relevant case is *McCulloch v. Ford Dealers Advertising Assn.* (1991) 234 Cal.App.3d 1385(*McCulloch* ) which discussed liability of a corporate sponsor. There, the plaintiff participated in and won a highly publicized car race but the promoters refused to pay him the promised prize money. He sued, among others, a corporate sponsor of the race (a Ford car dealer association) for negligent misrepresentation because its logo had appeared on the promotional materials for the race which included the promise of prize money. The

trial court granted summary judgment in favor of the association, finding that the presence of the corporate logo on the promotional materials did not constitute an "assertion" by the association that the prize money would be paid. The appellate court affirmed, concluding that as a matter of law the association had no duty to investigate the truth of the statements found in the promotional materials. The association had taken no part in making the (false) promise and the only connection between its conduct and the plaintiff's injury "was an aura of legitimacy given to the race by the participation of a nationally known sponsor."(*Id.* at p. 1391.)The court acknowledged that the corporate sponsorship "may have been significant from plaintiff's point of view" but it was not "a sufficient basis for holding the Association as guarantor of the truth of all statements made by the organizers of the race."(*Ibid.*)

Lastly, *Winter v. G.P. Putnam's Sons* (9th Cir.1991) 938 F.2d 1033(*Winter* ) applied California law to decide whether a publisher could be liable for injuries caused by a reader's reliance upon inaccurate information contained in one of its books. The defendant published a reference book about collecting and eating mushrooms. The plaintiffs purchased the book and, relying upon its contents, picked and ate mushrooms which caused them to become critically ill. The plaintiffs sued the defendant on various theories, including negligence.

Using California law, the federal appellate court held that as a matter of law the publisher had no duty to investigate the accuracy of book it published. It explained: "A publisher may of course assume such a burden, but there is nothing inherent in the role of publisher or the surrounding legal doctrines to suggest that such a duty should be imposed on publishers. Indeed the cases uniformly refuse to impose such a duty. Were we tempted to create this duty, the gentle tug of the First Amendment and the values embodied therein would remind us of the social costs."(*Id.* at p. 1037, fns. omitted.) In addition, the court rejected the plaintiffs' arguments that the publisher had a duty to warn that (1) the consumer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-04475-LAK    Document 13-2    Filed 07/03/2008    Page 18 of 48
Not Reported in Cal.Rptr.3d                                                    Page 5
Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.))**

should not fully rely on the information in the book because it was not complete and (2) the publisher did not guarantee the book's accuracy because it had not investigated the text. It reasoned: "With respect to the first, a publisher would not know what warnings, if any, were required without engaging in a detailed analysis of the factual contents of the book. This would force the publisher to do exactly what we have said he has no duty to do-that is, independently investigate the accuracy of the text. We will not introduce a duty we have just rejected by renaming it a 'mere' warning label. With respect to the second, such a warning is unnecessary given that *no* publisher has a duty as a guarantor."(*Id.* at pp. 1037-1038.)

**\*5** Two cases stand in contrast to the above authorities. Each found that in *limited* circumstances, a publisher could be held liable to a consumer for injuries caused by a product it had endorsed or advertised.

The first is *Hanberry, supra,* 276 Cal.App.2d 680. There, the plaintiff suffered personal injuries after purchasing and using a product advertised in Good Housekeeping magazine. The product carried the magazine's "Consumers' Guaranty Seal" seal of approval which contained the promise: " 'If the product or performance is defective, Good Housekeeping guarantees replacement or refund to consumer.' " In addition, the magazine explained the seal to mean: " 'We satisfy ourselves that products advertised in Good Housekeeping are good ones and that the advertising claims for them in our magazine are truthful.' " (*Hanberry, supra,* 276 Cal.App.2d at p. 682.) Based upon the seal, the plaintiff sued Good Housekeeping's publisher, Hearst Corporation.

The appellate court held that the plaintiff had properly pled a cause of action for negligent misrepresentation against Hearst. It reasoned as follows."Implicit in the seal and certification is the representation [Hearst] has taken reasonable steps to make an independent examination of the product endorsed, with some degree of expertise, and found

it to be satisfactory. Since the very purpose of [Hearst's] seal and certification is to induce consumers to purchase products so endorsed, it is foreseeable certain consumers will do so, relying upon [Hearst's] representations concerning them, in some instances, even more than upon statements made by the retailer, manufacturer or distributor. [¶] Having voluntarily involved itself into the marketing process, having in effect loaned its reputation to promote and induce the sale of a given product, the question arises whether [Hearst] can escape liability for injury which results when the product is defective and not as represented by its endorsement. In voluntarily assuming this business relationship, we think ... Hearst has placed itself in the position where public policy imposes upon it the duty to use ordinary care in the issuance of its seal and certification of quality so that members of the consuming public who rely on its endorsement are not unreasonably exposed to the risk of harm."(*Id.* at p. 684.)In another portion of the opinion, the court explained: "[Hearst] held itself out as a disinterested third party which had examined the [product], found [it] satisfactory, and gave its endorsement. By the very procedure and method it used, [Hearst] represented to the public it possessed superior knowledge and special information concerning the product it endorsed. Under such circumstance, [Hearst] may be liable for negligent representations of either fact or opinion."(*Id.* at p. 686.)

*FNS Mortgage Service Corp. v. Pacific General Group, Inc.* (1994) 24 Cal.App.4th 1564(*FNS* ) built upon *Hanberry.*In *FNS,* the issue was whether the publisher of a trade journal which examined and rated products owed a duty of due care to a purchaser injured by a nonconforming product. The publisher, a nonprofit professional association, undertook to inspect plumbing products to certify conformity with uniform standards it had promulgated, standards adopted throughout the state as part of local building codes. The publisher further enforced the uniform standards by delisting or withdrawing certification of products subsequently found to be nonconforming. The lawsuit alleged that the pub-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-04475-LAK    Document 13-2    Filed 07/03/2008    Page 19 of 48    Page 6

Not Reported in Cal.Rptr.3d
Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.))**

lisher had been negligent in failing either to inspect or to delist a particular product.

**\*6** The appellate court concluded that the publisher had "undertaken to render the service of inspecting pipe manufacturers and delisting those who are unwilling or unable to adhere to standards it has promulgated. It should recognize that these services are necessary for the protection of third persons, consumers who will acquire the pipe and install it in improvements to realty. Indeed, such protection is one of [the publisher's] avowed purposes. [Its] failure to exercise reasonable care in its undertakings increases the risk of harm to such consumers from defective pipe that otherwise would have been removed from the stream of commerce."(*Id.* at p. 1572.)

Applying the teachings of all of the above cases, we conclude that the allegations in the first amended complaint are insufficient as a matter of law to establish that defendants owed any duty to plaintiffs. In contrast to *Hanberry,* defendants did not formally endorse the hosts and their companies or represent that they had independently examined them and were satisfied they were qualified and honest. Instead, defendants simply provided a forum for their investment programs. Similarly, in contrast to *FNS,* defendants never explicitly represented that they had reviewed the qualifications and integrity of the hosts and that the hosts met a particular standard. Because defendants never undertook the task of vetting or recommending the hosts, no duty to plaintiffs arose.

Contrary to what plaintiffs argue, their allegation that the radio stations "endorsed" the hosts is insufficient to bring this case within *Hanberry* or *FNS.* In reviewing the sufficiency of their complaint against defendants' demurrer, we accept as true "all material facts properly pleaded, *but not* contentions, deductions or *conclusions of fact* or law."(*Serrano v. Priest* (1971) 5 Cal.3d 584, 591, italics added.) Plaintiffs' allegation of an endorsement is completely conclusory because it does not refer to any specific "endorsement." Read in context of their

complaint, it is nothing more than an allegation that defendants' mere presentation of the programs was the functional equivalent of an endorsement.[FN4] But as *Walters* instructs, merely printing an advertisement in a magazine does not constitute an endorsement of the product because there is neither a representation about the product nor a specific effort to promote it. By the same reasoning, the mere fact that defendants engaged the hosts to broadcast financial shows did not equate with an endorsement of their services or a warranty of their integrity.

> FN4. At the hearing, the trial court observed: "The facts as alleged state that the defendants' 'endorsement' arose implicitly by giving the individual defendants a platform, that is the radio show."

Plaintiffs' allegations about defendants' status and influence in the Korean community do not support a contrary conclusion. Their claim is similar to the argument rejected in *Walters* that the plaintiff could reasonably misconstrue an advertisement as an implied endorsement because the magazine targeted teenage girls. That a publisher or radio station has a niche audience does not create a duty when one does not otherwise exist. To paraphrase *McCulloch,* while the hosts' appearances on defendants' shows "may have been significant from [plaintiffs'] point[s] of view," it is not "a sufficient basis for holding [defendants]" liable for the hosts' misappropriation of plaintiffs' funds. (*McCulloch, supra,* 234 Cal.App.3d at p. 1391.)

**\*7** Before turning to an analysis of plaintiffs' specific causes of action, it bears noting that plaintiffs have *not* alleged that they lost their money because they relied upon the hosts' inaccurate advice to make specific investments, advice which defendants purportedly had a duty to investigate.[FN5] Nor have they alleged that they relied on the content of any broadcast created by defendants. Instead, they allege that they lost money because, relying upon the patina of legitimacy conferred upon the hosts by defendants, they transferred money to the hosts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.))**

Page 7

who then stole it. Hence, plaintiffs advance the novel claim, unsupported by citation to any pertinent authority, that defendants had a duty to monitor the hosts' actions to ensure that the hosts invested the money as represented.

> FN5. Were that the claim, it would fail. Multiple courts have rejected it on the theory that a mass media broadcaster does not warrant or guarantee the advice dispensed by its hosts and therefore owes no duty to the general public who views or listens to the broadcasts. (*Brandt v. Weather Channel, Inc.* (S.D.Fla.1999) 42 F.Supp.2d 1344, 1346; see also *First Equity Corp. of Florida v. Standard & Poor's Corp.* (2d Cir.1989) 869 F.2d 175 [publisher of financial publication has no liability under Florida law to investor for negligent misstatements contained in a summary of a corporation's offering]; *Stancik v. CNBC* (N.D.Ohio 2006) 420 F.Supp.2d 800 [television broadcaster of financial show has no liability under Ohio law to investor for a commentator's negligence]; *Pittman v. Dow Jones & Co., Inc.* (E.D.La.1987) 662 F.Supp. 921 [publisher of the Wall Street Journal not liable under Louisiana law to reader for negligent misrepresentation because an advertisement contained incorrect information]; *Amann v. Clear Channel Communications* (Ohio App. 1 Dist.2006) 846 N.E.2d 95 [radio station did not owe listeners a duty of due care to verify accuracy of advertisement promoting a financial plan]; and *Gutter v. Dow Jones, Inc.* (Ohio 1986) 490 N.E.2d 898 [publisher of the Wall Street Journal not liable to reader for negligent misrepresentation because an article contained incorrect information].)

With the above analysis in mind, we address each cause of action.

The lynchpin of a negligent undertaking theory of liability is that the defendant undertook to render services to another and did so without due care. (*Paz v. State of California* (2000) 22 Cal.4th 550, 559.) Here, defendants did not undertake to render services *to plaintiffs* but, instead, merely performed their traditional roles of broadcasting programs to the public. Plaintiffs' allegations about defendants' specific involvement in the production of the programs (create content, provide voice commentary, role play) does not change this result because that is what a broadcaster typically does: create and produce a program. None of these allegations even comes close to alleging that defendants undertook to investigate the hosts' qualifications, to recommend the hosts' services, or to warrant the hosts' integrity. Therefore, no duty to plaintiffs arose, be that to investigate the hosts before broadcasting their shows or to conduct a follow-up investigations to confirm the hosts were properly investing money given to them by plaintiffs.[FN6]

> FN6. Because we conclude no duty arose based upon an undertaking theory, we need not discuss whether plaintiffs have sufficiently alleged damages (physical harm) within the meaning of that tort.

Plaintiffs' cause of action for negligent endorsement founders on its failure to allege a specific endorsement of the hosts. After defendants demurred to plaintiffs' original pleading, the trial court granted them leave to amend to cure their conclusory allegation about endorsement. Plaintiffs' first amended pleading failed to amplify upon that allegation. We therefore presume plaintiffs have stated as strong a case as possible.[FN7] (See *Otworth v. Southern Pac. Transportation Co.* (1985) 166 Cal.App.3d 452, 457.) The pleading fails to allege any affirmative statement by defendants that they had investigated the expertise of the hosts and, based upon that investigation, warranted or guaranteed their abilities or integrity. Absent such a specific allegation, there is no endorsement and hence no duty to plaintiffs. As already explained, the conclusory allegation that defendants "endorsed" the hosts is insufficient as a

Not Reported in Cal.Rptr.3d
Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.))**

Page 8

matter of law to bring the case with *Hanberry.*Further, the claim of an "implied endorsement" fails because no reasonable listener would infer an endorsement simply because a radio station broadcasts a program. (See *Walters, supra,* 195 Cal.App.3d 1119.)

> FN7. On appeal, plaintiffs stand on the allegations of the first amended complaint. They do not seek leave to file another pleading.

**\*8** Plaintiffs' cause of action for negligent misrepresentation fails for two reasons. To the extent that plaintiffs aver that defendants negligently misrepresented the hosts' qualifications, the claim lacks the required specificity. Plaintiffs never alleged any specific representation made by either defendant. That omission is fatal. (See *Cadlo v. Owens-Illinois, Inc.* (2004) 125 Cal.App.4th 513, 519 ["The policy of liberal construction of pleadings is not generally invoked to sustain a misrepresentation pleading defective in any material respect"].) To the extent that plaintiffs allege an "implied" misrepresentation, the tort "requires a 'positive assertion.' An 'implied' assertion or representation is not enough."(*Residential Capital v. Cal-Western Reconveyance Corp.* (2003) 108 Cal.App.4th 807, 828.)

Lastly, we briefly discuss *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, a case to which plaintiffs make multiple references. There, a radio station ran a contest rewarding the first contestant to locate its disc jockey, "The Real Don Steele." The disc jockey drove throughout the city in a "conspicuous red automobile" as the station periodically broadcast his movements. (*Id.* at p. 44.)A contestant caused a fatal accident while attempting to reach him. The Supreme Court concluded that the radio station owed a duty to the decedent because the nature of its promotional contest created a foreseeable risk of harm: the radio stations' teenage listeners would drive carelessly and injure third parties in an effort to be the first to reach the disc jockey and claim the prize. The case is inapposite. Defendants'

"role in bringing ideas and information to the public bears no resemblance to the *Weirum* scenario."(*Winter, supra,* 938 F.2d at p. 1037, fn. 8.)

### DISPOSITION

The judgment (order of dismissal) is affirmed.

We concur: MANELLA and SUZUKAWA, JJ.
Cal.App. 2 Dist.,2007.
Park v. Korea Radio USA, Inc.
Not Reported in Cal.Rptr.3d, 2007 WL 3358139 (Cal.App. 2 Dist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE



Caution
As of: Jul 02, 2008

**In re MOTEL 6 SECURITIES LITIGATION; REDTAIL LEASING, INC., individually and on behalf of all others similarly situated, Plaintiffs, -against- HUGH THRASHER, et al., Defendants. ROBERT J. ROSENER, individually and on behalf of all others similarly situated, Plaintiffs, -against- HUGH THRASHER, et al., Defendants.**

**93 Civ. 2183 (JFK), 93 Civ. 2866 (JFK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1997 U.S. Dist. LEXIS 3909; Fed. Sec. L. Rep. (CCH) P99,454**

**April 1, 1997, Decided**
**April 2, 1997, FILED**

**DISPOSITION:** [*1] Defendant Hirsh's motion to dismiss the RICO and Securities and Exchange Act claims denied, and the motion to dismiss the New York General Business Law claim, and common law fraud and unjust enrichment claims granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sellers filed claims against defendant buyer under theories of common law fraud and unjust enrichment, as well as RICO, the Securities and Exchange Act, and the New York General Business Law. The buyer filed a motion to dismiss.

**OVERVIEW:** The sellers claimed that they sold their shares and call options during the period that the buyer purchased them, that the purchase was based upon material inside information regarding an impending acquisition, and that the buyer was unjustly enriched at their expense. The buyer's motion to dismiss the Securities and Exchange Act claim was denied because the court had addressed the adequacy of the sellers' allegations that they traded contemporaneously with the buyer on a prior motion for class certification. The court also denied dismissal on the RICO claim because the sellers adequately pleaded the required pattern of racketeering activity and a causal connection between the RICO violation and

their injury. The court dismissed the fraud claim because the sellers failed to allege facts that they directly relied on the buyer's omissions. The unjust enrichment claim was also dismissed because the sellers did not allege any direct dealings or actual, substantive relationship with the buyer. The New York General Business Law claim was dismissed for reasons given in a prior order.

**OUTCOME:** The motion to dismiss was granted with respect to the New York General Business Law claim, the common law fraud claim, and the unjust enrichment claim. The motion to dismiss was denied with respect to the RICO and the Securities and Exchange Act claims.

**CORE TERMS:** conspiracy, fraud claim, motels, pleaded, unjust enrichment, insider trading, contemporaneous, omission, common law fraud, trading, inside information, factual allegations, privity, common law, predicate act, continuity, direct dealings, disclose, material omissions, racketeering activity, proximate cause, trader, contemporaneously, investor, enriched, tipping, traded, Securities Exchange Act, law claims, call options

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*

1997 U.S. Dist. LEXIS 3909, *; Fed. Sec. L. Rep. (CCH) P99,454

***Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims***

[HN1]A motion to dismiss for failure to state a claim should be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. The factual allegations set forth in the complaint must be accepted as true and the court must view the allegations in the light most favorable to the pleader.

***Civil Procedure > Justiciability > Standing > General Overview***

[HN2]Only those investors who trade contemporaneously with the inside trader have standing to sue on an insider trading claim.

***Securities Law > Liability > RICO Actions > General Overview***

[HN3]Where a material omission serves as the basis for a RICO § 10(b) claim, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor would have considered them important in the making of this decision. Once a plaintiff shows the materiality of the omission for a § 10(b) claim, and thus reliance, defendant can avoid liability by proving by a preponderance of the evidence that disclosure of that information would not have altered plaintiff's investment decision.

***Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements***
***Securities Law > Liability > RICO Actions > General Overview***

[HN4]To demonstrate a RICO conspiracy, the plaintiff must show that the defendant agreed to commit the substantive racketeering offense through agreeing to participate in two predicate acts, that he knew the general nature of the conspiracy, and that the conspiracy extended beyond his individual role. In addition, those two predicate crimes must, as with every other RICO violation, constitute a pattern of racketeering activity.

***Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > General Overview***

[HN5]Common law fraud claims must be supported by factual allegations demonstrating plaintiff's actual, direct reliance on the misrepresentation or omission.

***Contracts Law > Remedies > Restitution***

[HN6]In order to recover for unjust enrichment under New York law, a plaintiff must show that (1) defendant is enriched, (2) enrichment is at plaintiff's expense, and (3) the circumstances are such that equity and good conscience require defendant to make restitution.

**COUNSEL:** APPEARANCES:

For Plaintiffs: SACHNOFF & WEAVER, Chicago, Illinois, Of Counsel: Jonathan S. Quinn, John W. Moynihan. POLLACK & GREENE, LLP, New York, New York, Of Counsel: Alan M. Pollack. LAWRENCE WALNER & ASSOCIATES, Chicago, Illinois, Of Counsel: Lawrence Walner. SUSMAN, BUEHLER & WATKINS, Chicago, Illinois, Of Counsel: Charles R. Watkins. ROBIN J. OMAHANA, Chicago, Illinois, Of Counsel: Robin J. Omahana.

For Defendant Jonathan Hirsh: NAGLER & ASSOCIATES, Beverly Hills, CA, Of Counsel: Lawrence H. Nagler, Robert M. Zaab.

**JUDGES:** JOHN F. KEENAN, United States District Judge

**OPINION BY:** JOHN F. KEENAN

**OPINION**

*OPINION AND ORDER*

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Defendant Jonathan Hirsh's motion to dismiss, pursuant to Fed. R. Civ. Pro. 12(b)(6), Plaintiffs' Securities Exchange Act claims, New York General Business Law claim, and common law fraud and unjust enrichment claims. For the reasons stated below, the Court grants [*2] Defendant's motion in part and denies Defendant's motion in part.

*Background*

Plaintiffs allege a nationwide insider trading scheme by persons who possessed material, nonpublic information concerning the proposed acquisition of Motel 6, L.P., a Dallas-based national chain of owner-operated economy motels, by Accor, S.A. ("Accor"), a French-based company. [1] Plaintiffs were the holders of call options on Motel 6 securities. Plaintiffs assert that Defendants were part of a conspiracy to trade on highly sensitive inside information about tender offer negotiations occurring in New York between Motel 6's largest shareholder, Kohlberg Kravis Roberts & Company ("KKR"), and Accor. Defendant Hugh Thrasher ("Thrasher") was executive vice-president of Motel 6 in charge of communication at

1997 U.S. Dist. LEXIS 3909, *; Fed. Sec. L. Rep. (CCH) P99,454

the time of the tender offer negotiations. Thrasher allegedly tipped Carl V. Harris ("Harris") about the tender offer negotiations in May 1990. Am. Compl. PP 94-95. Harris then allegedly told nine others, including Defendant Jeffrey Sanker. Am. Compl. PP 97-99, 110-12, 121, 125, 162, 177-180. Jeffrey Sanker allegedly tipped Defendant Jonathan Hirsh, who then purchased Motel 6 call options. Am. Compl. [*3] 168-169. Plaintiffs claim Hirsh realized illegal profits of at least $ 29,262 from these transactions in his personal securities accounts. Am. Compl. P 169. Hirsh also allegedly entered into a partnership with Defendant Lee Rosenblatt to trade Motel 6 securities through Rosenblatt's securities account and split the illegal profits. Pursuant to that partnership, these Defendants realized profits of about $ 360,000, of which Defendant Hirsh received $ 180,000. Am. Compl. PP 170-74. Hirsh is also alleged to have tipped Defendant Roger Odwak. Am Compl. PP 175-76.

> 1    The Court has also discussed the facts underlying this action in *In re Motel 6 Securities Litigation v. Thrasher*, 1995 U.S. Dist. LEXIS 9954, No. 93-2183, 1995 WL 431326 (S.D.N.Y. July 20, 1995). That decision addressed a prior motion to dismiss by certain other Defendants in this action and provides a background against which this Court bases this decision.

Plaintiffs further contend that the scheme to trade on inside information also included a conspiracy to cover-up the alleged [*4] tipping and trading activity through fraud, perjury, money laundering, the widespread dissemination of inside information, and the willful failure to disclose material facts. Am. Compl. PP 69, 87, 164, 189, 200, 201, 206-07, 212, 224.

### Discussion

[HN1]A motion to dismiss for failure to state a claim should be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957). The factual allegations set forth in the complaint must be accepted as true, *see Zinermon v. Burch*, 494 U.S. 113, 118, 110 S. Ct. 975, 979, 108 L. Ed. 2d 100 (1990), and the Court must view the allegations in the light most favorable to the pleader. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974).

As a preliminary matter, the Court will not readdress arguments addressed or decided in the July 5, 1995 Opinion and Order denying a motion to dismiss the RICO claims by Defendants Chammah, Kuznetsky, Schor, Thrasher, and Darrell Sandy Marsh. The Court assumes the readers' familiarity with that decision. [*5]

Additionally, the Court notes that in his reply papers Defendant Hirsh raised an argument regarding Plaintiffs' failure to specifically allege their losses for RICO standing. In that Hirsh did not raise this argument in his papers in support of the motion to dismiss, and Plaintiffs did not have a chance to address the argument, the Court declines to address the issue raised for the first time in reply papers.

### A. The Securities Exchange Act Claims

Defendant Hirsh argues that the Securities Exchange Act claims must be dismissed because the Amended Complaint fails to allege that Plaintiffs' trades were contemporaneous with those of Hirsh.

The Second Circuit has held that [HN2]only those investors who trade contemporaneously with the inside trader have standing to sue on an insider trading claim. *See Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94-95 (2d Cir. 1981). Defendant argues that Plaintiffs have not adequately pleaded contemporaneous trading because the Amended Complaint does not specifically allege the dates of the purchases and sales of Hirsh and Plaintiffs to demonstrate contemporaneous trading. Defendant therefore contends that the Plaintiffs have not [*6] demonstrated standing and the federal securities law claims must be dismissed.

In the September 16, 1996 decision granting Plaintiffs' motion for class certification, this Court addressed the issue as to the adequacy of Plaintiffs' allegations that they traded contemporaneously with the Defendants. Several Defendants had argued that the Plaintiffs did not have standing because they "pleaded the bare legal conclusion that they traded 'contemporaneously' with defendants but only plaintiff Redtail has specified in the Amended Complaint what it traded and when." Defs. Joint Mem. in Supp. of Class Cert. at 20. Addressing this argument, the Court stated:

> Defendants also argue that the proposed class representatives are inadequate because the proposed representatives, especially Hull Trading, are not contemporaneous sellers of securities and therefore lack standing. . . The Court disagrees. The Court finds that a motion to dismiss and not a motion for class certification would have been the proper vehicle to raise this argument. The Court nevertheless finds that Plaintiffs adequately alleged the standing of the proposed representatives such that they would have survived a pre-discovery [*7] motion to dismiss: any more detailed examination of the representative Plaintiffs' contemporaneous

trading status before discovery and the development of the record would be premature. Defendants are of course free to reassert their argument under the contemporaneous trading rule after discovery as a defense to liability.

*In re Motel 6 Securities Litigation*, 1996 U.S. Dist. LEXIS 13642, 1996 WL 531819, at *2 (S.D.N.Y. Sept. 18, 1996). This holding is equally applicable to the argument Defendant Hirsh makes here.

## B. The RICO Claims

Defendant argues that the RICO claims must be dismissed because the Amended Complaint fails to plead (1) a causal connection between the RICO violation and Plaintiffs' injury, and (2) the required pattern of racketeering activity.

### 1. RICO's Proximate Cause Requirement

Defendant asserts that the RICO claims are governed by common law concepts of proximate cause, which are narrower than the proximate cause requirement for a § 10(b) insider trading claim based upon material omissions brought by contemporaneous traders on a public market. Defendant recognizes that for this particular type of § 10(b) securities fraud claim a plaintiff need not demonstrate [*8] contractual privity or actual reliance on a defendant's omissions of material inside information. The contemporaneous trading requirement serves as a proxy for contractual privity in a § 10(b) claim, and consequently, a plaintiff need not show actual reliance on the omission for standing in such an insider trading action. However, the RICO proximate cause requirement means that a plaintiff must prove both transaction and loss causation, which requires actual reliance, and therefore Defendant argues that Plaintiffs must show a direct relationship between the fraud-doing defendant and the RICO plaintiff. Insofar as Plaintiff has not adequately alleged privity with Defendant Hirsh or actual reliance on his material omission, Defendant contends that the RICO claims based on securities fraud cannot survive because Plaintiff has not adequately met the RICO proximate cause requirement. Defendant makes the argument that "since reliance--which is required under RICO, is *not* required under § 10(b) as broadly read to permit insider trading claims by contemporaneous traders on a public market, such claims are not actionable under RICO." Defs. Mem. in Supp. at 9.

The Supreme Court has held [*9] that [HN3]where a material omission serves as the basis for the § 10(b) claim,

positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor [would] have considered them important in the making of this decision.

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54, 92 S. Ct. 1456, 1472, 31 L. Ed. 2d 741 (1972); *see also duPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987) (stating that for a § 10(b) and Rule 10b-5 claim, "in instances of total non-disclosure, . . . it is of course impossible to demonstrate reliance" and finding that reliance may be presumed where the plaintiff proves that the facts withheld are material in the sense that a reasonable investor would have considered them important (quoting *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S. Ct. 70, 46 L. Ed. 2d 59 (1975))). Once a plaintiff shows the materiality of the omission for a § 10(b) claim, and thus reliance, defendant can avoid liability by proving by a preponderance of the evidence that disclosure of that information would not [*10] have altered plaintiff's investment decision. *See duPont*, 828 F.2d at 78. In the instant case, Plaintiffs have adequately pleaded reliance to support a § 10(b) and Rule 10b-5 claim. The Court does not accept Hirsh's view that Plaintiffs, contemporaneous traders on a public market, alleging insider trading claims as a predicate act in a RICO action must show actual reliance on the omission and privity beyond that required for the § 10(b) claim. The Supreme Court, and this Circuit, have recognized that actual reliance need not be proved for a § 10(b) insider trading claim based on material omissions and brought by contemporaneous traders because it is near impossible to prove such reliance. To accept Defendant's argument--requiring proof of actual reliance for such § 10(b) nondisclosure claims which are pleaded as RICO predicate acts--would necessitate application of a standard of proof for such claims that the Supreme Court and this Circuit abandoned as unworkable. This Court declines to impose an actual reliance requirement for § 10(b) omission claims pleaded as predicate acts in RICO actions.

### 2. RICO Continuity Requirement

Defendant Hirsh argues that in considering [*11] whether the RICO pattern requirement is met, including whether continuity is sufficiently alleged, the Court must separately evaluate the pattern of racketeering acts by each defendant. Hirsh contends that Plaintiffs have not sufficiently pleaded that he engaged in a pattern of racketeering activity because Plaintiffs do not adequately plead that he engaged in two predicate acts which represent a threat of continuity. Therefore, Hirsh argues that

1997 U.S. Dist. LEXIS 3909, *; Fed. Sec. L. Rep. (CCH) P99,454

the RICO claims must be dismissed as against him. Hirsh also makes an argument that while Plaintiffs make general conspiracy allegations, Plaintiffs have not alleged a RICO conspiracy because (1) they make no claim under 18 U.S.C. § 1962(d), which is the exclusive means for asserting a RICO conspiracy claim, and (2) Plaintiffs' conspiracy allegations are too conclusory.

The Court finds that Plaintiffs have adequately pleaded a pattern of racketeering activity by Hirsh. Plaintiffs have alleged that the twenty-four Defendants, including Hirsh, were part of a RICO conspiracy to trade on material, nonpublic information concerning Motel 6 and that this scheme included a continuing conspiracy to conduct illegal acts to cover-up the alleged tipping [*12] and insider trading activity concerning Motel 6. Plaintiffs have sufficiently pleaded that Defendant Hirsh participated in two predicate acts: Hirsh made illegal trades on inside information, utilizing mail or wire transmission to execute those trades, Am. Compl. PP 169, 194; Hirsh knowingly disclosed the inside information to Rosenblatt with the expectation of benefit and with knowledge that Rosenblatt would trade on that information, Am. Compl. P 170; and Hirsh agreed to pay and paid Sanker for the tip, Am. Compl. P 174. Whether these acts establish a threat of continued racketeering activity depends on the facts of each case, *H.J., Inc v. Northwestern Bell Tele. Co.*, 492 U.S. 229, 242, 109 S. Ct. 2893, 2902, 106 L. Ed. 2d 195 (1989), and "external facts may . . . provide evidence of the requisite threat of continuity. . . ." *United States v. Kaplan*, 886 F.2d 536, 542-543 (2d Cir. 1989), *cert. denied*, 493 U.S. 1076, 110 S. Ct. 1127, 107 L. Ed. 2d 1033 (1990). The Court need not examine one defendant's actions in isolation when considering continuity.

The allegations concerning Hirsh's activities indicate that Hirsh was aware that the insider trading was not limited to [*13] him, that others were involved in the tipping and trading, including a Motel 6 insider, and that the information was disseminated to many others who would trade on it. Plaintiffs allege a RICO conspiracy based upon close personal and business relationships among the Defendants. The Amended Complaint contains factual allegations that Defendants conspired to cover up the insider trading scheme through fraud, perjury, money laundering, the widespread dissemination of inside information, and the willful failure to disclose facts that they were under a legal duty to disclose. Am Compl. PP 69, 87, 164, 189, 200, 201, 206-07, 212, 224. Defendant Hirsh is specifically alleged to have played a role in this widespread dissemination of inside information by tipping Rosenblatt and Odwak. Am. Compl. PP 170-175. In the July 5, 1995 decision, the Court viewed the allegations in the light most favorable to Plaintiffs and found that Plaintiffs had adequately pleaded continuity. The allegations concerning Hirsh's insider trading,

his extending the conspiracy by disseminating information to others, his willingness to engage in the illegal actions of the conspiracy, and the close relationships among the [*14] Defendants, is enough at the pleading stage for this Court to find the same continuity with respect to Hirsh that this Court found in the July 5, 1995 decision. The Court gives Plaintiffs the benefit of the doubt on 12(b)(6) motions. Viewing the allegations in the light most favorable to the pleaders and drawing all reasonable inferences in their favor, the Court will deny Hirsh's motion to dismiss the RICO claims. Defendant Hirsh, however, may reassert these arguments and put the Plaintiffs to their proof in a post-discovery motion.

The Court also finds that Plaintiffs have adequately pleaded a RICO conspiracy claim. The heading of the very first claim cites 18 U.S.C. § 1962(d) and includes allegations of violations of that statute. The Court also finds that Plaintiffs' factual allegations sufficiently support the conspiracy claim against Defendant Hirsh. This Circuit has stated:

> [HN4][To demonstrate a RICO conspiracy, the plaintiff must show] that the defendant agreed to commit the substantive racketeering offense [here, Section 1962(b) and (c)] through agreeing to participate in two predicate acts, . . . that he [knew] the general nature of the conspiracy and that the [*15] conspiracy extended beyond his individual role.

*United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.), *cert. denied*, 493 U.S. 982, 110 S. Ct. 515 (1989). In addition, those "two predicate crimes" must, as with every other RICO violation, constitute a pattern of racketeering activity. *United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S. Ct. 118 (1984). The Plaintiffs "need not prove that a conspirator-defendant agreed with every other conspirator, or knew all the other conspirators, or had full knowledge of all the details of the conspiracy." *United States v. Rastelli*, 870 F.2d at 828. As discussed above, Plaintiffs adequately pleaded that Hirsh engaged in two predicate acts which constituted a pattern, and the factual allegations support a conclusion that Hirsh knew the nature of the conspiracy and that the conspiracy extended beyond his role.

## C. New York General Business Law Claim

Plaintiffs' New York General Business Law § 349(a) claim against Defendant Hirsh is dismissed for the same

reasons this Court dismissed this claim against Defendants Chammah, Kuznetsky, Schor, Thrasher and Marsh in the July 5, [*16] 1995 Opinion and Order. *See In re Motel 6 Securities Litigation*, 1995 U.S. Dist. LEXIS 9954, 1995 WL 431326, *6-7 (S.D.N.Y. July 20, 1995).

## D. Common Law Fraud Claim

Defendant argues that because a common law fraud claim requires privity and actual reliance, and the Amended Complaint does not allege direct dealings between the Plaintiffs and Hirsh or any facts which demonstrate direct reliance on the omissions, the fraud claim must be dismissed. This Court agrees to the extent that Plaintiffs have failed to alleged facts to support a claim that they directly relied on Defendants' omissions.

[HN5]Common law fraud claims must be supported by factual allegations demonstrating plaintiff's actual, direct reliance on the misrepresentation or omission. *See Golden Budha Corp. v. Canadian Land Co.*, 931 F.2d 196, 202 (2d Cir. 1991); *Turtur v. Rothschild Registry Int'l, Inc.*, 1993 U.S. Dist. LEXIS 11939, 1993 WL 338205, at *6 (S.D.N.Y. Aug. 27, 1993); *see also Aniero Concrete Company, Inc. v. New York City Construction Authority*, 1997 U.S. Dist. LEXIS 22, 1997 WL 3268, at *13 (S.D.N.Y. Jan. 3, 1997) ("The elements of fraudulent concealment under New York law are: a relationship between the contracting parties that creates a duty to disclose, knowledge [*17] of the material facts by the party bound to disclose, scienter, reliance, and damage."). Consequently, common law fraud claims

> are distinct from actions brought under the federal securities laws, which "permit a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market."
>
> Common law fraud cases such as the present one are therefore to be distinguished from cases that involved a fraud on the market theory or other theories in which reliance on a material omission is presumed to have existed and which are applicable primarily in the context of federal securities fraud claims arising under section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

*Turtur*, 1993 U.S. Dist. LEXIS 11939, 1993 WL 338205, at *7 (citations omitted); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 241-47, 108 S. Ct. 978, 988-91, 99 L. Ed. 2d 194 (1988) (observing that actions under §

10(b) and Rule 10b-5 are distinct from common law deceit and misrepresentation claims and are designed to add to the protections provided investors by common law). Plaintiffs contend that for a common law fraud claim based on an "omission" theory, reliance is presumed [*18] upon a showing that the omissions were material and that the defendant had a duty to disclose. Pls. Mem. in Opp. at 23 (citing *Pollack v. Laidlaw Holdings, Inc.*, 1995 U.S. Dist. LEXIS 5909, 1995 WL 261518, at *11 (S.D.N.Y. May 3, 1995)). Rather, this is the standard for showing reliance under a § 10(b) or Rule 10b-5 securities fraud claim based on a fraud on the market theory, not common law fraud, and the sole case Plaintiffs cite for this proposition discussed reliance under § 10(b)--not common law fraud. *See Pollack*, 1995 U.S. Dist. LEXIS 5909, 1995 WL 261518, at *11. Common law fraud claims do not enjoy a presumption of reliance once a material omission and duty to speak have been sufficiently pleaded. *See Turtur*, 1993 U.S. Dist. LEXIS 11939, 1993 WL 338205, at *7 ("Because common law fraud claims must be supported by a showing of direct reliance on the misrepresentation or omission, they are distinct from actions brought under the federal securities laws, which 'permit a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market.'"); *Schultz v. Commercial Programming Unlimited Inc.*, 1992 U.S. Dist. LEXIS 19557, 1992 WL 396434, at *4 (S.D.N.Y. 1992) (stating that "this Court will not permit Schultz to circumvent the [reliance] requirement [*19] by infusing the fraud on the market theory into his common law fraud action" and dismissing the common law fraud claim). Certainly, Plaintiffs have alleged facts to support a claim of reliance in their § 10(b) and Rule 10b-5 causes of action for insider trading based on a fraud on the market theory. However, where Plaintiffs' factual allegations focus solely on an insider trading conspiracy that perpetrated a fraud on the market, and Plaintiffs have alleged no connection to the Defendants other than the fact that Plaintiffs traded on the market contemporaneously with Defendants, Plaintiffs have not alleged facts to support a claim of actual, direct reliance on Defendants' omissions. In that Plaintiffs have failed to plead facts to support the direct reliance element of the common law fraud claim, the Court grants Defendant Hirsh's motion to dismiss the common law fraud claim. *Cf., In re 3COM Securities Litigation*, 761 F. Supp. 1411, 1419 (N.D. Cal. 1990) (finding that Plaintiff adequately pleaded a 10b-5 claim, but dismissing common law fraud claim because Plaintiff had not adequately pleaded actual reliance).

## E. Common Law Unjust Enrichment Claim

Defendant assets [*20] that under New York law, unjust enrichment is a quasi-contract claim and therefore requires direct dealing between the parties to submit to

Case 1:08-cv-04475-LAK    Document 13-2    Filed 07/03/2008    Page 28 of 48

1997 U.S. Dist. LEXIS 3909, *; Fed. Sec. L. Rep. (CCH) P99,454

the quasi-contract. In that Plaintiffs allege no such privity, direct dealings or actual relationship with Hirsh, Defendant argues that the unjust enrichment claim must be dismissed.

Plaintiffs counterargue that privity is not a required element of an unjust enrichment claim. In support of their position that privity is not an express requirement of the claim, Plaintiffs correctly point out the elements required:

> [HN6]In order to recover for unjust enrichment under New York law, a plaintiff must show that (1) defendant was enriched, (2) enrichment was at plaintiff's expense and (3) the circumstances were such that equity and good conscience require defendant to make restitution.

Pls.' Mem. in Opp. at 24 (citing *Violette v. Armonk Associates, L.P.*, 872 F. Supp. 1279, 1282 (S.D.N.Y. 1995)); *see also Dolmetta v. Unitak Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983).

This Court agrees with Defendant Hirsh's contention that an unjust enrichment claim requires some type of direct dealing or actual, substantive relationship with a defendant. [*21] While the elements of the unjust enrichment claim quoted by Plaintiffs do not explicitly spell out such a requirement, those elements imply a more substantive relationship, or greater connection, between a defendant and plaintiff than Plaintiffs have alleged in this case. The requirements that a defendant be enriched at plaintiff's expense and that good conscience necessitate that defendant make restitution to plaintiff, clearly contemplate that a defendant and plaintiff must have had some type of direct dealings or an actual, substantive relationship.

In the instant case, Plaintiffs do not allege any direct dealings or actual, substantive relationship with Defendants other than a "contemporaneous" trading relation-

ship. Plaintiffs claim that they sold their Motel Six shares or call options during the period in which Defendants purchased Six shares and options based upon material inside information regarding the impending acquisition of Motel Six by Accor. Plaintiffs contend that they would not have sold those shares or options had they known about the impending acquisition and that Defendants were unjustly enriched at Plaintiffs' expense in purchasing shares of Motel Six at the same [*22] time Plaintiffs sold their shares. These factual allegations do not sound in the quasi-contract common law claim of unjust enrichment. Without factual allegations that Plaintiffs had a more substantive connection to the Defendants beyond a contemporaneous trading relationship, Plaintiffs have not alleged facts to support a claim that Defendants were unjustly enriched at the Plaintiffs' expense and that Defendants should make restitution to Plaintiffs. *Cf.* *Martes v. USLIFE Corp.*, 927 F. Supp. 146, 149 (S.D.N.Y. 1996) (holding that an unjust enrichment claim lies only where the defendant possesses money or received a benefit which defendant should not retain because it belongs to the plaintiff, and dismissing the unjust enrichment claim because defendant received nothing that belonged to plaintiff or had no contractual or other relationship with plaintiff). Therefore, the Court grants Defendant Hirsh's motion to dismiss the unjust enrichment claim.

### Conclusion

For the reasons stated above, the Court denies Defendant Hirsh's motion to dismiss the RICO and Securities and Exchange Act claims, and grants the motion to dismiss the New York General Business Law claim, and common [*23] law fraud and unjust enrichment claims.

**SO ORDERED.**

**Dated: New York, New York**

**April 1, 1997**

**JOHN F. KEENAN**

**United States District Judge**

LEXSEE



Positive
As of: Jul 02, 2008

**WEST 79TH STREET CORP., Plaintiff, - against - CONGREGATION KAHL MINCHAS CHINUCH, CHAIM BABAD, C. BABAD MANAGEMENT, LLC, BABAD MANAGEMENT CO., SHELDON BECKER, ALAN BERENBAUM, RICK LESCH, THE BOARD OF MANAGERS OF THE ATRIUM CONDOMIN- IUM, SIGNATURE PROPERTIES NY, LLC, ALON VAKNIN, BLAKE BAKNIN, A. HOSPITALITY CO., INC. d/b/a METRO-HOME.COM, METRO-HOME.COM and LINDA COUGHLIN, Defendants.**

**03 Civ. 8606 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2004 U.S. Dist. LEXIS 19501**

**September 29, 2004, Decided
September 30, 2004, Filed**

**DISPOSITION:** Defendants' motions to dismiss were granted. Leave to replead was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporation sued defendants, including a religious congregation, a representative of a condominium/cooperative, its president, and a management corporation, alleging civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) under 18 U.S.C.S. § 1962. State law claims were asserted against the "board defendants." Trespass was asserted against all defendants. Pending were three defendant groups' motions to dismiss.

**OVERVIEW:** The dispute related to a "cond-op." Plaintiff claimed it was injured as a result of defendants' alleged hotel operation in that the purported hotel operation damaged its interests as owner of the commercial unit and led to increased wear and tear. It claimed that its property rights were interfered with and that it was deprived of rental income. Overall, to state a claim for civil damages, plaintiff had the burden of alleging that defendants violated the substantive RICO statute and that it was injured in its business by reason of the violation. The court determined that plaintiff had not adequately

pleaded a violation of the RICO statute. Plaintiff failed to state a claim because it failed to allege predicate acts of racketeering activity. It had not adequately pleaded mail and wire fraud as a predicate. The viability of its racketeering claim depended on the adequacy of its deficient money laundering allegations. Its allegations that defendants violated tax laws failed to identify grounds that the allegations constituted predicate racketeering activities. Plaintiff did not otherwise adequately plead a claim under § 1962(a) and (c) and did not adequately plead a § 1962(d) claim.

**OUTCOME:** The complaint for civil RICO violations was dismissed with prejudice, the remaining claims were dismissed without prejudice, and the case was closed.

**CORE TERMS:** racketeering, racketeering activity, unlawful activity, hotel, mail, money laundering, predicate act, purported, apartment, predicate, interstate, pled, wire, supplemental jurisdiction, entity, wire fraud, fraudulent, federal claims, condominium, indirectly, defraud, factual allegations, collectively, invested, replead, residing, state laws, internal quotation marks omitted, foreign commerce..., constituting

**LexisNexis(R) Headnotes**

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
[HN1]In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court should construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor, although mere conclusions of law or unwarranted deductions need not be accepted. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Dismissal is appropriate when it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
[HN2]See 18 U.S.C.S. § 1964(c).

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview***
[HN3]See 18 U.S.C.S. § 1962.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview***
***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Remedies***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview***
[HN4]To state a claim for civil damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), a plaintiff has a twofold pleading burden. First, the plaintiff must allege that the defendant has violated the substantive RICO statute, 18 U.S.C.S. § 1962. Second, the plaintiff must allege that he or she was injured in his or her business or property by reason of the violation of § 1962.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***International Trade Law > General Overview***

[HN5]To plead a violation of the substantive Racketeer Influenced and Corrupt Organizations Act (RICO) statute, a plaintiff must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a pattern (4) of racketeering activity (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an enterprise (7) the activities of which affect interstate or foreign commerce. RICO is a specialized statute requiring a particular configuration of elements. These elements cannot be incorporated loosely from a previous narration, but must be tightly particularized and connected in a complaint. Parroting statutory language while generally referring the reader back to the previous 100 paragraphs in a complaint is inadequate.

***Banking Law > Criminal Offenses > Money Laundering***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Travel Act > Elements***
[HN6]Racketeering activity consists of no more and no less than the commission of a predicate act. The Racketeer Influenced and Corrupt Organizations Act (RICO) defines "racketeering activity" as any act that is indictable under, inter alia, 18 U.S.C.S. §§ 1956 (prohibiting money laundering), 1957 (prohibiting engaging in monetary transactions in property derived from specified unlawful activity), 1341 (prohibiting mail fraud), 1343 (prohibiting wire fraud), and 1952 (prohibiting racketeering). 18 U.S.C.S. § 1961(1)(B). A "pattern of racketeering activity" is defined as requiring the commission of at least two of the predicate acts enumerated in 18 U.S.C.S. § 1961(1) within a 10 year period.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements***
[HN7]An "enterprise" under the Racketeer Influenced and Corrupt Organizations Act (RICO) includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C.S. § 1961(4). This list is illustrative rather than restrictive. Nonetheless, certain characteristics must be established to prove a RICO enterprise exists: (1) it must be an ongoing organization, formal or informal; (2) it must function as a continuing unit; and (3) it must be more than the

pattern of racketeering activity--that is, it must be an entity separate and apart from the pattern of activity in which it engages.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview*

[HN8]Because the mere assertion of a Racketeer Influenced and Corrupt Organizations Act (RICO) claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation. To this end, courts must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*

[HN9]To state a claim under 18 U.S.C.S. § 1962(a) and (c), a plaintiff must allege that a defendant engaged in two or more acts constituting a pattern of racketeering activity.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Mail Fraud > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Wire Fraud > General Overview*

[HN10]To establish the predicate act of mail or wire fraud a plaintiff must allege that the defendants engaged in (1) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires. It must be alleged that the defendant knowingly participated in the scheme and that the misrepresentations were material. Although the mail or wire communications at issue need not themselves contain fraudulent communications, they must be incident to an essential part of the scheme, which itself has a fraudulent and deceptive purpose.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*

*Criminal Law & Procedure > Criminal Offenses > Fraud > Wire Fraud > General Overview*

[HN11]Where a plaintiff is alleging predicate acts involving mail and wire fraud, the allegations must satisfy the particularity requirement of Fed. R. Civ. P. 9(b). According to Rule 9(b) in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Criminal Law & Procedure > Scienter > General Intent*

[HN12]To satisfy Fed. R. Civ. P. 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. While knowledge of the fraud or intent to defraud on the part of the defendant may be averred generally, Rule 9(b) also requires such allegations of scienter to be supported by facts giving rise to a strong inference that defendant knew the statements to be false and intended to defraud plaintiff. A plaintiff may satisfy pleading requirements with allegations either that the defendants engaged in consciously fraudulent behavior, or that they had motive and a clear opportunity to commit fraud. Acts done inadvertently, mistakenly, or in good faith without an intent to defraud are insufficient to satisfy the knowledge and criminal intent elements of the mail and wire fraud statutes.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*

[HN13]In the context of the Racketeer Influenced and Corrupt Organizations Act and Fed. R. Civ. P. 9(b), where more than one defendant is charged with fraud, the plaintiff must particularize and prove each defendant's participation in the fraud and each defendant's enactment of the two necessary predicate acts.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*

[HN14]On a motion to dismiss, only those documents attached to, incorporated by reference in, or relied upon by a complaint may be considered by the court in assessing the complaint's sufficiency.

2004 U.S. Dist. LEXIS 19501, *

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Travel Act > Elements*
[HN15]See 18 U.S.C.S. § 1952(a).

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Travel Act > General Overview*
[HN16]See 18 U.S.C.S. § 1952(b).

*Banking Law > Criminal Offenses > Money Laundering*
*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Money Laundering > Elements*
[HN17]18 U.S.C.S. § 1957 prohibits the knowing engagement or attempt to engage in a monetary transaction in property derived from specified unlawful activity where the value of that property exceeds $ 10,000. 18 U.S.C.S. § 1957(a). The phrase "specified unlawful activity" as employed by 18 U.S.C.S. § 1957 takes its meaning from 18 U.S.C.S. § 1956. 18 U.S.C.S. § 1957(f)(3).

*Banking Law > Criminal Offenses > Money Laundering*
*Contracts Law > Negotiable Instruments > Transfers*
*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Money Laundering > Elements*
[HN18]18 U.S.C.S. § 1956 prohibits any person or entity from conducting or attempting to conduct various financial transactions as well as from transferring or attempting to transfer monetary instruments or funds by parties with varying degrees of intent or states of knowledge. 18 U.S.C.S. § 1956(a). Each of the prohibited acts set forth in § 1956(a) requires that the property at issue be or be believed to be proceeds derived from a specified unlawful activity or that the conduct at issue otherwise attempt to promote or conceal a "specified unlawful activity." In short, in the absence of allegations concerning a specified unlawful activity, no claim for money laundering may withstand a motion to dismiss.

*Banking Law > Criminal Offenses > Money Laundering*
*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Money Laundering > Elements*
[HN19]The more inclusive description of "some form of unlawful activity" in 18 U.S.C.S. § 1956(a)(1) is relevant only to the knowledge element of a money laundering violation under § 1956(a)(1) and does not mitigate or alter the statutory requirement that the financial transaction at issue in fact involve the proceeds of specified unlawful activity. 18 U.S.C.S. § 1956(a)(1).

*Banking Law > Criminal Offenses > Money Laundering*
*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Money Laundering > Elements*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements*
[HN20]The phrase "specified unlawful activity" is defined in 18 U.S.C.S. § 1956(c)(7) to embrace a long list of prohibited conduct, including the various types of racketeering activity set forth in 18 U.S.C.S. § 1961(1), as well as more than 70 other types of criminal conduct. 18 U.S.C.S. § 1956(c)(7)(B)-(F).

*Banking Law > Criminal Offenses > Money Laundering*
*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Money Laundering > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN21]The underlying offense element of 18 U.S.C.S. §§ 1956 and 1957 must be distinct from the money laundering allegation itself.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview*
*Banking Law > Criminal Offenses > Money Laundering*
*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Money Laundering > General Overview*
[HN22]While a plaintiff need not allege money laundering with great particularity where the money laundering is not premised on fraud, a plaintiff must plead all elements of the offense in order to adequately plead money

laundering as a predicate act under the Racketeer Influenced and Corrupt Organizations Act and withstand motions to dismiss.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview***
[HN23]A violation of 18 U.S.C.S. § 1962(a) consists of investing income derived from a pattern of racketeering activity to acquire an interest in, establish, or operate an enterprise; the violation is not established by mere participation in predicate acts of racketeering. Accordingly, under the plain terms of the statute, for a violation of § 1962(a) to occur, a plaintiff must allege injury by reason of the defendants' investment of racketeering income in an enterprise. A violation of this section is not established by showing participation in the alleged pattern of racketeering activity, or the derivation of income from that pattern, but is established instead by showing the use or investment of that income in acquiring, establishing or operating an enterprise. The "by reason of" language in the context of a § 1962(a) violation requires that the alleged injury must have been caused by the investment of the racketeering proceeds.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview***
[HN24]To allege an investment injury under 18 U.S.C.S. § 1962(a), a plaintiff must plead two elements: first, that the defendants used or invested racketeering income to acquire or maintain an interest in the alleged enterprise, and second, that the plaintiff suffered an injury as a result of that investment by the defendants. Failure to satisfy this two part test will result in the dismissal of the plaintiffs' claims.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements***
[HN25]Under 18 U.S.C.S. § 1962(a), the investment injury alleged must be distinct from any injury arising from the predicate racketeering acts themselves.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview***
[HN26]The injury causation requirement of 18 U.S.C.S. § 1962(a) is not satisfied by allegations that a defendant, which is also the enterprise, invested the racketeering income in its general operations. As a matter of law, reinvestment of racketeering income is insufficient to make out a cause of action under the Racketeer Influenced and Corrupt Organizations Act (RICO). This is so because where reinvestment of racketeering proceeds back from the same RICO enterprise is alleged, the injuries stem proximately not from the investment, but from the predicate acts that make up the racketeering activity.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements***
[HN27]Allegations that income derived directly or indirectly from the purported racketeering activity was reinvested into the same enterprise allegedly responsible for that activity are insufficient as a matter of law to sustain an 18 U.S.C.S. § 1962(a) claim.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements***
[HN28]The "enterprise" referred to in 18 U.S.C.S. § 1962(a), unlike the "enterprise" of § 1962(c), is not intended to be the vehicle through which a pattern of racketeering is undertaken, but a separate, legitimate entity purchased through monies raised through racketeering.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview***

[HN29]The essence of a violation of 18 U.S.C.S. § 1962(a) is not commission of predicate acts but investment of racketeering income.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview***
[HN30]18 U.S.C.S. § 1962(c) imposes liability only upon defendants who operate or manage Racketeer Influenced and Corrupt Organizations (RICO) enterprises. To satisfy § 1962(c)'s requirement, a plaintiff must plead each defendant's participation in the operation or management of an enterprise. One is liable under RICO if he or she has discretionary authority in carrying out the instructions of the conspiracy's principals, or played some part in directing the affairs of the RICO enterprise. RICO liability may not be imposed on a defendant who merely carries on its own professional activities.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
[HN31]In the context of the Racketeer Influenced and Corrupt Organizations Act, there is a meaningful difference between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient because the test is not involvement but control.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview***
[HN32]Merely rendering services to an alleged enterprise does not establish that a person or entity controls the enterprise for purposes of 18 U.S.C.S. § 1962(c).

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview***
***Civil Procedure > Justiciability > Standing > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview***

[HN33]To state a civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim under 18 U.S.C.S. § 1962(c), a plaintiff must allege injury resulting from defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The RICO statute limits standing to plaintiffs whose injuries were both factually and proximately caused by the RICO violation.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements***
[HN34]18 U.S.C.S. § 1962(d) prohibits any person from conspiring to violate any of the substantive provisions of § 1962(a), 1962(b) and 1962(c). In order to establish a violation of § 1962(d), the U.S. Supreme Court has held that a conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense. In other words, a Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy claim cannot stand where the elements of the substantive RICO provisions are not met.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview***
[HN35]A plaintiff's failure to adequately plead facts that would satisfy the pleading requirements of 18 U.S.C.S. § 1962(a) or (c) necessarily dooms any claim it might assert arising under § 1962(d).

***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court***
[HN36]In general, leave to replead should be freely given when justice so requires. Fed. R. Civ. P. 15(a). Notwithstanding this liberal practice, leave to replead may be denied if repleading would be futile. An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

***Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview***

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview*

[HN37]The fact that the remaining claims in an action arise under state law does not require automatic dismissal for lack of subject matter jurisdiction. To the contrary, the district court may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction, although it cannot exercise supplemental jurisdiction unless there is first a proper basis for original federal jurisdiction. The statutory authority for the exercise of such supplemental jurisdiction is found in 28 U.S.C.S. § 1367(c)(3), according to which a district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C.S. § 1367(c)(3). Nonetheless, in general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.

**COUNSEL:** [*1] MORRISON COHEN SINGER & WEINSTEIN, Attorneys for Plaintiff, New York, NY, By: EDWARD P. GILBERT, ESQ., ANDREW SCHRIEVER, ESQ., Of Counsel.

EDWIN RUBIN, ESQ., New York, NY. ISRAEL VIDER, ESQ., Brooklyn, NY, Attorneys for Congregation Kahal Minchas Chinuch, Chaim Babad, C. Babad Management, LLC, Babad Management Co., Sheldon Becker, Alan Berenbaum, Rick Lesch and The Board of Managers of the Atrium Condominium.

WAYNE GREENWALD, Attorneys for Signature Properties NY, Alon Vaknin, Blake Vaknin, New York, NY, By: WAYNE GREENWALD, ESQ., Of Counsel.

REISS, EISENPRESS & EISENBERG, Attorneys for Linda Coughlin and Metro-Home, New York, NY, By: SHERRI L. EISENPRESS, ESQ., LLOYD M. EISENBERG, ESQ., Of Counsel.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

**Sweet, D.J.,**

In three separate motions, defendants Congregation Kahl Minchas Chinuch ("KMC"), Chaim Babad ("Babad"), C. Babad Management, LLC and Babad Management Co. (collectively, "Babad Management"), Shel-

don Becker ("Becker"), Alan Berenbaum ("Berenbaum"), Rick Lesch ("Lesch"), the Board of Managers of the Atrium Condominium (the "Atrium Board"), Signature Properties NY, LLC ("Signature"), Alon Vaknin ("Alon"), [*2] Blake Vaknin ("Blake"), Linda Coughlin ("Coughlin") and Metro-Home NY LLC ("Metro-Home") (sued herein as A Hospitality Co. Inc. ("Hospitality") d/b/a/ Metro-Home.com ("Metro-Home.com")) (collectively, "Defendants ") have moved to dismiss the complaint of plaintiff West 79th Street Corp. ("W79") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motions are granted, and this case is closed.

*Parties*

W79 is a corporation organized under the laws of the State of New York with its principal place of business at 276 Fifth Avenue, Suite 708, New York, New York.

The Atrium Board is alleged to be the statutory representative of The Atrium Condominium ("The Atrium" or the "Cond-op"), a condominium/cooperative created pursuant to a

Declaration of Condominium recorded on April 17, 1984 (the "Declaration"), and located at 160 Bleeker Street, New York, New York. The Cond-op consists of a Commercial Unit and a Residential Unit.

KMC is alleged to be a not-for-profit religious corporation organized under the laws of the State of New York as a domestic not-for-profit organization. [*3] KMC is owned and/or controlled by Babad.

Babad is an individual residing in Brooklyn, New York. He is alleged to be President of the Atrium Board as well as President of the Board of Directors of the Residential Unit (the "Residential Unit Board") and the owner of Babad Management.

C. Babad Management, LLC, is alleged to be a corporation organized under the laws of the State of New York. Babad Management Co. is allegedly a domestic business whose address is in Brooklyn, New York.

Becker is an individual residing in Brooklyn, New York, who, it is alleged, previously resided at The Atrium and is a member of the Atrium Board and of the Residential Unit Board. He is allegedly employed by Babad Management.

Berenbaum is an individual residing in New York, New York, and an alleged member of the Atrium Board and of the Residential Unit Board.

Lesch is an individual residing in Scarsdale, New York, who is alleged to have previously resided at The

Atrium and to be a member of the Atrium Board and of the Residential Unit Board.

Signature is alleged to be a domestic business whose corporate address is care of Alon in New York, New York. Alon and Blake are individuals both residing in New [*4]  York, New York and both are alleged to be principals of Signature.

Metro-Home is alleged to be a domestic business with offices located at 515 Madison Avenue, New York, New York. Coughlin is an individual residing in New York, New York, and an alleged principal of Metro-Home.

### Prior Proceedings

W79 commenced this action on October 31, 2003, [1] alleging, as a first cause of action against all Defendants and the basis for this Court's subject matter jurisdiction under 28 U.S.C. § 1331, civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as codified in 18 U.S.C. § 1962. The complaint further asserts claims against KMC, Babad, Babad Management, Becker, Berenbaum, Lesch, and the Atrium Board (collectively, the "Board Defendants") for breach of fiduciary duty, breach of contract and of the implied covenant of good faith and fair dealing, ultra vires acts, an accounting, and conversion, and seeks a declaratory judgment. A final claim of common-law trespass is asserted against all Defendants.

> 1    The filing of this action appears to be the latest volley in a long-standing dispute among many of the parties named herein, thus far litigated in the state courts. See, e.g., Bd. of Managers of the Atrium Condominium v. West 79th Street Corp., 2 A.D.3d 246, 770 N.Y.S.2d 17 (N.Y. App. Div. 1st Dep't 2003) (affirming a trial court's December 26, 2001 ruling that W79 held neither title to nor an easement over the vaults or west cellar adjacent to or under the Cond-op).

[*5]  Signature, Alon, and Blake (collectively, the "Signature Defendants"), and Coughlin and Metro-Home (collectively, the "Metro-Home Defendants") separately moved to dismiss W79's complaint on December 22, 2003, on the grounds that W79 failed to state a RICO claim against them, failed to satisfy Fed. R. Civ. P. 9(b) in its RICO claim, and, with regard to the Metro-Home Defendants, failed to state a claim for common-law trespass against them. The Board Defendants thereafter filed a motion to dismiss W79's complaint raising similar grounds. Following further briefing by the parties, oral arguments were heard on March 24, 2004, at which time the motions were deemed fully submitted.

### The Facts

The following facts are drawn from W79's complaint and do not constitute findings of fact by the Court.

According to the complaint, the Cond-op is a two-unit condominium/cooperative located in Greenwich Village, consisting of a Commercial Unit owned by W79 and a Residential Unit owned by a coop corporation named 160 Bleeker Street Owners Corp. (the "Coop Corporation"). The Commercial Unit consists of space in the basement and first floor of the [*6]  building, including several retail stores, two apartments and space in the ground floor cellar which contains a club or theater space and storage spaces for the retail stores above. The Residential Unit consists of 189 apartments on floors 2 through 10 of the Cond-op.

The Cond-op, it is alleged, is governed by the Declaration and By-Laws that were filed with the State of New York at the time of conversion of the property into a Cond-op in 1984. Pursuant to the Cond-op's By-Laws, the affairs of the Condominium are to be governed by the Board, which at all relevant times was comprised of Babad, Becker, Lesch, Berenbaum, as well as a single representative from W79's Commercial Unit. Pursuant to Section 9(a) of the Declaration, "no commercial business shall be permitted in the Residential Unit." (Compl. at P 50 (internal quotation marks omitted).)

W79 alleges that in or about 1984, 160 Bleeker Street Associates, the original coop sponsor, converted the building from a rental building into a cooperative apartment complex pursuant to an Offering Plan for the Cooperative Ownership of the Residential Unit of the Atrium Condominium (the "Offering Plan") filed with the Attorney General of [*7]  the State of New York. The Offering Plan was subsequently amended to a non-eviction plan. Of the 189 apartments in the Residential Unit, 115 of the apartments (the "Unsold Shares") are owned by KMC, a successor to 160 Bleeker Street Associates. Babad purchased these 115 Unsold Shares through KMC in or about March 1995. KMC is owned by Babad, whose father founded KMC in the 1950's.

As part of the transaction to purchase the unsold shares, according to the complaint, Babad insisted that the Coop Corporation discharge existing building management and instead retain Babad Management to manage the property. The Coop Corporation, acting in the name of the Cond-op Board, executed a contract with Babad Management to run the building. Babad Management named Becker to be responsible for management of the building.

Babad is alleged to have acted in violation of the Cond op's By-Laws and the Offering Plan in various ways, including by exercising voting control over the Residential Unit Board since taking controlling ownership of the Residential Unit and electing and appointing

his own Residential Unit Board, including himself, Becker, Berenbaum and Lesch. It was on this basis that Babad was [*8] able to take control of the Atrium Board pursuant to Article III, § 1 of the By-Laws, which provides that the Residential Unit has the right to designate four members of the Atrium Board.

Becker, Berenbaum and Lesch are all allegedly beholden to and controlled by Babad. Becker is employed by Babad's management company and Berenbaum and Lesch also receive financial remuneration from Babad or entities controlled by Babad.

According to the complaint, the Board Defendants' control of both the Residential Unit Board and the Atrium Board has allowed them to operate a "short stay" hotel in The Atrium, and they have combined apartments (a structural modification) in violation of the Declaration and applicable law. It is alleged upon information and belief that KMC and Babad purchased the Unsold Shares for the purpose of retaining the Unsold Shares and leasing apartments and/or operating a hotel while sheltering the profits through a tax-exempt religious corporation, KMC, for the benefit and profit of all Defendants.

Signature and Metro-Home, through the control of Alon, Blake and Coughlin, are alleged to be acting in concert with the Board Defendants and to be facilitating the advertising [*9] and booking of Babad's apartments through the use of the World Wide Web. Signature is further alleged to be a party to the Board Defendants' violations of the Declaration, By-Laws and Certificate of Occupancy, *inter alia*, through its maintenance of an office at 160 Bleeker Street in a suite that Signature rents from Babad through KMC or owns as a result of a transfer from Babad or KMC.

It is alleged upon information and belief that KMC's tax-exempt status as a religious corporation allows "them" to avoid paying various state and local taxes that a hotel would normally pay. (Compl. at P 83.) It is further alleged upon information and belief that none of the proper fire and safety permits necessary to run a hotel have been procured.

W79 claims that it has been injured as a result of the alleged hotel operation in that the purported hotel operation damages the interests of W79 as owner of the Commercial Unit, leads to increased wear and tear, thereby causing Defendants to charge higher maintenance fees assessed in the form of common charges, and decreases the value of the property. W79 further claims that increased fees have resulted from expenses such as maid service and towel [*10] service necessitated by the claimed hotel operation and that W79 has been injured by the hotel operation insofar as its apartment has been used to run the hotel housekeeping services, thus interfering with its property rights and depriving W79 of

rental income. W79 also alleges that it has been forced to incur the expense of over $ 1 million in infrastructure improvements and repairs.

### Discussion

[HN1]In considering a motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citing *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) [*11] (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)). Dismissal is appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

### I. W79 Has Not Adequately Pled a Violation of the RICO Statute

W79's first cause of action against Defendants arises under RICO, which provides a private right of action for [HN2]"any person injured in his business or property by reason of a violation of Section 1962 [of Title 18]." 18 U.S.C. § 1964(c). W79 has alleged that Defendants violated Section 1962(a), Section 1962(c), and Section 1962(d). [2]

> 2   In certain of their moving papers Defendants argue that a claim under subsection (b) of Section 1962 should be dismissed. As W79 cites only subsections (a), (c), and (d) in its papers submitted in opposition to the various motions to dismiss, it is deemed to have abandoned any claim that it may have sought to make in the complaint under subsection (b).

[*12]   Section 1962 provides, in relevant part:

> [HN3](a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of

which affect, interstate or foreign commerce... .

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ... .

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962. [HN4]To state a claim for civil damages under RICO, a plaintiff has a twofold pleading burden. First, the plaintiff must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962. [*13] *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). Second, the plaintiff must allege that he or she was injured in his or her business or property by reason of the violation of Section 1962. *See* 18 U.S.C. § 1964(c); *Moss*, 719 F.2d at 17.

[HN5]To plead a violation of the substantive RICO statute, a plaintiff must allege the existence of seven constituent elements: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss*, 719 F.2d at 17 (citing 18 U.S.C. §§ 1962(a), 1962(b) and 1962(c)); *The Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.*, 154 F. Supp. 2d 682, 690 (S.D.N.Y. 2001). As has been explained on a previous occasion,

RICO is a specialized statute requiring a particular configuration of elements. These elements cannot be incorporated loosely from a previous narration, but must be tightly [*14]   particularized and connected in a complaint. Parroting statutory language while generally referring the reader back to the previous 100 paragraphs in a complaint is inadequate.

*Lesavoy v. Lane*, 304 F. Supp. 2d 520, 532 (S.D.N.Y. 2004) (quoting *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 284 (S.D.N.Y. 1991)) (internal quotation marks and citation omitted).

[HN6]Racketeering activity "consists of no more and no less than the commission of a predicate act." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985). RICO defines "racketeering activity" as any act that is indictable under, *inter alia*, 18 U.S.C. §§ 1956 (prohibiting money laundering),1957 (prohibiting engaging in monetary transactions in property derived from specified unlawful activity), 1341 (prohibiting mail fraud), 1343 (prohibiting wire fraud), and 1952 (prohibiting racketeering). 18 U.S.C. § 1961(1)(B). A "pattern of racketeering activity" is defined as "requiring the commission of at least two of the predicate acts enumerated in 18 U.S.C. § 1961(1) within a [*15]   ten year period." *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1344 (2d Cir. 1994); *see also* 18 U.S.C. § 1961(5); *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 257 (2d Cir. 2004).

[HN7]An "enterprise" under RICO "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This list is illustrative rather than restrictive. *See United States v. Masters*, 924 F.2d 1362, 1366 (7th Cir. 1991) ("The statute says 'enterprise includes' -- not 'enterprise means.' The point of the definition is to make it clear that it need not be a formal enterprise."); *United States v. Huber*, 603 F.2d 387, 394 (2d Cir. 1979) ("The definition of 'enterprise' is a list beginning with the word 'includes.' This indicates that the list is not exhaustive but merely illustrative."). Nonetheless, certain characteristics must be established to prove a RICO enterprise exists: "(1) it must be 'an ongoing organization, formal or informal'; (2) it must function as a [*16]   continuing unit; and (3) it must be more than the 'pattern of racketeering activity' -- that is, it must be 'an entity separate and apart from the pattern of activity in which it engages.'" *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345, 365 (E.D.N.Y. 2000) (quoting *United States v. Turkette*, 452 U.S. 576, 583, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981)).

It has been suggested that "the civil provisions of [RICO] are the most misused statutes in the federal corpus of law." *Spoto v. Herkimer County Trust*, 2000 U.S. Dist. LEXIS 6057, No. 99 Civ. 1476, 2000 WL 533293, at *1 (N.D.N.Y. 2000); *see also Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000) ("I surmise that every member of the federal bench has before him or her at least one -- and possibly more -- garden variety fraud or breach of contract cases that some Plaintiff has attempted to transform into a vehicle for treble damages by resort to what [has been] referred to as 'the litigation equivalent of a thermonuclear device' -- a civil RICO suit.") (quoting *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998) (quoting *Katzman v. Victoria's*

*Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) [*17] (citations omitted), *aff'd*, 113 F.3d 1229 (2d Cir. 1997))). [HN8]"Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Katzman*, 167 F.R.D. at 655 (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)); *accord Schmidt*, 16 F. Supp. 2d at 346. To this end, courts must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing.

Here, as set forth below, W79 has failed to state a claim under RICO because it has failed to allege "predicate acts" of racketeering activity and otherwise failed to allege a violation of subsections (a), (c) and (d) of Section 1962.

**A. *W79 Has Not Adequately Pled a Predicate Racketeering Activity***

[HN9]To state a claim under Subsections 1962(a) and 1962(c), a plaintiff must allege that a defendant engaged in two or more acts constituting a pattern of racketeering activity. *see also Moss*, 719 F.2d at 17; *see also USA Certified Merchants, LLC v. Koebel*, 262 F. Supp. 2d 319, 331 (S.D.N.Y. 2003), [*18] *reconsideration denied*, 273 F. Supp. 2d 501 (S.D.N.Y. 2003). W79 alleges that Defendants engaged in predicate acts insofar as Defendants' conduct with respect to the purported hotel operation amounts to mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, racketeering in violation of 18 U.S.C. § 1952, and money laundering in violation of 18 U.S.C. §§ 1956 and 1957, each of which indictable offenses constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B). W79 also alleges that Defendants "avoided tax obligations under the Internal Revenue Code, New York State tax laws, and violated New York law, including but not limited to the Martin Act and other state and local laws prohibiting the illegal operation of a hotel as well as the Declaration and By-Laws and Certificate of Occupancy for the Cond-op." (Compl. at P 105.) Defendants argue that W79's allegations of predicate acts are insufficient and require dismissal of W79's RICO claim.

**1. *Mail and Wire Fraud***

[HN10]To establish the predicate act of mail or wire fraud a plaintiff must allege [*19] that "the defendants engaged in '(1) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires.'" *USA Certified Merchants*, 262 F. Supp. 2d at 332 (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)); *see also O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990). It must be alleged that "the defendant knowingly participated in the

scheme and that the misrepresentations were material." *USA Certified Merchants*, 262 F. Supp. 2d at 332 (citing *Autuori*, 212 F.3d at 115; *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996)); *see also Laro, Inc. v. Chase Manhattan Bank (Nat'l Ass'n)*, 866 F. Supp. 132, 137 (S.D.N.Y. 1994), *aff'd*, 60 F.3d 810 (2d Cir. 1995). Although the mail or wire communications at issue "need not themselves contain fraudulent communications, [. . .] they must be 'incident to an essential part of the scheme,' which itself has a fraudulent and deceptive purpose. *USA Certified Merchants*, 262 F. Supp. 2d at 332 [*20] (quoting *Schmuck v. United States*, 489 U.S. 705, 711, 103 L. Ed. 2d 734, 109 S. Ct. 1443 (1989)).

[HN11]Where a plaintiff is alleging predicate acts involving mail and wire fraud, the allegations must satisfy the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure. *See McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992); *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 49 (2d Cir. 1987), *overruled on other grounds*, *United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (*en banc*); *USA Certified Merchants*, 262 F. Supp. 2d at 332. According to Rule 9(b),

> In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b).

[HN12]To satisfy Rule 9(b), a complaint "must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state [*21] when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989); *see also Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992-93 (7th Cir. 1991) (explaining that mere references to plans and schemes are too conclusory to satisfy Rule 9(b)); *Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 512 (S.D.N.Y. 1990) (concluding that allegations that "the entire loan transaction was part of a scheme by all defendants or some of them to gain 'control' of [a] venture" were inadequate to withstand a motion to dismiss as the complaint "sets forth no facts from which the existence of such a scheme reasonably can be inferred"). "While knowledge of the fraud or intent to defraud on the part of the defendant may be averred generally, Rule 9(b) also requires such allegations of 'sci-

enter' to be supported by facts giving rise to a strong in-ference that defendant knew the statements to be false and intended to defraud plaintiff." *Arons v. Lalime*, 3 F. Supp. 2d 314, 325 (W.D.N.Y. 1998) (citing *Ouaknine v. MacFarlane*, 897 F.2d 75, 79-80 (2d Cir. 1990); [*22] *Beck*, 820 F.2d at 50; *Finkel v. Stratton Corp.*, 754 F. Supp. 318, 328 (S.D.N.Y. 1990), *aff'd in part and rev'd in part*, 962 F.2d 169 (2d Cir. 1992)). A plaintiff may satisfy pleading requirements with allegations "either that the defendants engaged in consciously fraudulent behavior, or that they had motive and a 'clear opportu-nity' to commit fraud." *Citadel Managmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 155 (S.D.N.Y. 2000) (quoting *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995)). "Acts done inadvertently, mistakenly, or in good faith without an intent to defraud" are insuffi-cient to satisfy the knowledge and criminal intent ele-ments of the mail and wire fraud statutes. *O'Malley*, 896 F.2d at 706; *see also Arons*, 3 F. Supp. 2d at 325.

In addition, [HN13]where more than one defendant is charged with fraud, the plaintiff must "particularize and prove each defendant's participation in the fraud and each defendant's enactment of the two necessary predi-cate acts." *USA Certified Merchants*, 262 F. Supp. 2d at 332 (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); [*23] *Lakonia Mgmt. Ltd. v. Meriwether*, 106 F. Supp. 2d 540, 550 (S.D.N.Y. 2000); *Moeller v. Zaccaria*, 831 F. Supp. 1046, 1056 (S.D.N.Y. 1993)).

W79 has not adequately pled mail and wire fraud as a predicate racketeering activity against any of Defen-dants. First, no use of the interstate mails has been al-leged in the complaint with any specificity as to the cir-cumstances of its use, [3] nor has W79 mentioned any purported use of the United States mails in its opposition papers in anything other than abstract terms, vitiating W79's claim of mail fraud. Insofar as W79 argues in a footnote in its opposition papers that Defendants have violated the mail and wire fraud statutes by using the interstate mails and wire to evade paying taxes to the state and federal governments (*see* Pl. Opp. Mem. at 36 n.13), the complaint contains no allegations as to how interstate mails and wire were used by Defendants to accomplish this goal or which Defendants are alleged to have acted in such a manner, and the claim thus fails under Rule 9(b), Fed. R. Civ. P.

> 3     The complaint merely asserts in a conclu-sory manner that Defendants made use of the mails and gives no indication as to when the mails were used, what materials were sent, or to whom. (*See*, e.g., Compl. at P 9 ("The Board De-fendants work in conjunction with the other named Defendants to accomplish their racketeer-

ing scheme by actively *employing the use of the interstate mail* and wires through which Defen-dants advertise and rent Babad's units . . . .") (emphasis supplied), P 104 ("Defendants have collectively engaged in and conspired to engage in a pattern of racketeering activity affecting in-terstate commerce by *using the mail* and wires with intent to distribute the proceeds of their unlawful activity and otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, and/or carrying on, of their unlawful activity . . . . ") (emphasis sup-plied).

[*24]   Second, although the Signature Defendants and the Metro-Home Defendants are alleged to have "fa-cilitated the advertising and booking of Babad's apart-ments through the use of the world-wide web" (Compl. at P 82), the Complaint contains no allegations that the Board Defendants themselves employed the World-Wide Web, and, accordingly, fails to set forth with requisite particularly the purportedly fraudulent conduct attribut-able to each Defendant and the two predicate acts attrib-utable to each Defendant.

Moreover, although W79 alleges that Defendants have operated an "illegal hotel which is advertised and booked on the world wide web" (Compl. at P 105), it is not clear in what manner this alleged operation consti-tutes a scheme to defraud or whom it is intended to de-fraud. Specifically, there are no allegations in the com-plaint that those who have booked the accommodations allegedly advertised by the Signature Defendants and the Metro-Home Defendants received something other than what was advertised. Although the advertisements at issue occasionally refer to the accommodations offered as an "alternative hotel" (as well as referring to them as "suites" and "apartments"), the inclusion [*25]   of the modifier "alternative" signals that the property at issue is something other than a standard hotel, thus muting any argument that the accommodations were fraudulently advertised as hotel rooms. Even if the representation that the accommodations were an "alternative hotel" were deemed fraudulent, the complaint is devoid of any fac-tual allegations establishing Defendants' individualized fraudulent intent.

In light of the foregoing, W79's pleading fails to sat-isfy the requirements of Fed. R. Civ. P. 9(b) and the gen-eral prerequisites for pleading a predicate act of mail and wire fraud, as it does not set forth the circumstances con-stituting fraud with particularity, identify the fraud al-leged to be attributable to each Defendant, or allege facts giving rise to a strong inference that each Defendant knew any purportedly fraudulent statements to be false and intended to defraud or acted with reckless indiffer-ence to the truth. [4]

4    Insofar as W79 relies on an affidavit sub-
mitted in opposition to the various motions to
dismiss the complaint, such reliance is misplaced.
[HN14]On a motion to dismiss, only those
documents attached to, incorporated by reference
in, or relied upon by a complaint may be consid-
ered by the Court in assessing the complaint's
sufficiency. *See, e.g., Citadel Mgmt., Inc. v. Tele-
sis Trust, Inc.,* 123 F. Supp. 2d 133, 147 & n.3
(S.D.N.Y. 2000).

[*26]    **2. Racketeering**

W79 has also alleged that Defendants' actions con-
stituted racketeering under Section 1952 of Title 18,
which sets forth penalties for:

[HN15]Whoever travels in interstate
or foreign commerce or uses the mail or
any facility in interstate or foreign com-
merce, with intent to --

(1) distribute the pro-
ceeds of any unlawful ac-
tivity; or ...

(3) otherwise promote,
manage, establish, carry on,
or facilitate the promotion,
management,    establish-
ment, or carrying on, of
any unlawful activity,

and thereafter performs or attempts to
perform [an act described in paragraphs
(1)-(3)] ... .

18 U.S.C. § 1952(a). The phrase "unlawful activity" is
defined as

[HN16](1) any business enterprise
involving gambling, liquor ..., narcotics or
controlled substances ..., or prostitution
offenses ..., (2) extortion, bribery, or ar-
son . ..., or (3) any act which is indictable
under subchapter II of chapter 53 of title
31, United States Code, or under section
1956 or 1957 of this title ... .

18 U.S.C. § 1952(b).

Of the activities enumerated in 18 U.S.C. § 1952(b),
only [*27]   Sections 1956 and 1957 of Title 18, the
money laundering provisions, are mentioned in W79's

complaint. Thus, the viability of W79's racketeering
claim depends on the adequacy of its money laundering
allegations which, as set forth below, are themselves
deficient. Accordingly, W79 has failed to adequately
allege racketeering as a predicate act, as it has not ade-
quately pled an underlying "unlawful activity."

**3. Money Laundering**

[HN17]Section 1957 of Title 18 prohibits the know-
ing engagement or attempt to engage in a monetary
transaction in property "derived from specified unlawful
activity" where the value of that property exceeds $
10,000.   18 U.S.C. § 1957(a). The phrase "specified
unlawful activity" as employed by Section 1957 takes its
meaning from Section 1956. *See* 18 U.S.C. § 1957(f)(3).

[HN18]Section 1956 of Title 18 similarly prohibits
any person or entity from conducting or attempting to
conduct various financial transactions as well as from
transferring or attempting to transfer monetary instru-
ments or funds by parties with varying degrees of intent
or states of knowledge. *See* 18 U.S.C. § 1956 [*28]   (a).
Each of the prohibited acts set forth in Subsection (a)
requires that the property at issue be or be believed to be
proceeds derived from a "specified unlawful activity" or
that the conduct at issue otherwise attempt to promote or
conceal a "specified unlawful activity." *Id.* In short, in
the absence of allegations concerning a "specified
unlawful activity," no claim for money laundering may
withstand a motion to dismiss. [5]

5    W79 notes that 18 U.S.C. § 1956(a)(1) also
refers to "some form of unlawful activity," and
argues that a predicate act of money laundering is
established by the mere showing that the pro-
ceeds in question derived either from a "specified
unlawful activity" or from the more encompass-
ing category of "some form of unlawful activity,"
which latter, W79 argues, includes Defendants'
purported tax violations. The statutory language
squarely contradicts W79's claim. The subsection
in question provides that: "Whoever, knowing
that the property involved in a financial transac-
tion represents the proceeds of some form of
unlawful *activity*, conducts or attempts to conduct
such a financial transaction which in fact involves
the proceeds of specified unlawful activity . . .
shall be sentenced . . . ." 18 U.S.C. § 1956(a)(1)
(emphasis supplied). The clause "knowing that
the property involved in a financial transaction
represents the proceeds of some form of unlawful
activity" is elsewhere defined as meaning that
"the person knew the property involved in the
transaction represented proceeds from some form,
though not necessarily which form, of activity
that constitutes a felony under State, Federal, or

foreign law, regardless of whether or not such activity is specified in paragraph (7) [defining "specified unlawful activity"]." 18 U.S.C. § 1956(c)(1). Contrary to W79's contention, [HN19]the more inclusive description of "some form of unlawful activity" is thus relevant only to the knowledge element of a money laundering violation under Subsection 1956(a)(1) and does not mitigate or alter the statutory requirement that the financial transaction at issue "in fact involve[] the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1).

[*29]  [HN20]The phrase "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to embrace a long list of prohibited conduct, including the various types of racketeering activity set forth in 18 U.S.C. § 1961(1), see 18 U.S.C. § 1956(c)(7)(A), as well as more than 70 other types of criminal conduct. See 18 U.S.C. §§ 1956(c)(7)(B)-(F). W79 argues that the "specified unlawful activity" underlying its money laundering claims is the same as the predicate racketeering activities alleged here, namely mail and wire fraud, money laundering and racketeering.

Because W79's allegations of mail and wire fraud are insufficient for the reasons set forth above, the "specified unlawful activity" required here may not be satisfied by reference to those allegations. Moreover, as W79 has not sufficiently pled a racketeering predicate act -- for want of sufficient money laundering allegations -- racketeering may not be said to constitute a "specified unlawful activity" with regard to the money laundering claim.

As for money laundering, although the statutory scheme set forth in 18 U.S.C. § 1956 [*30]  (c)(7) admits to an argument that a money laundering offense could constitute the "specified unlawful activity" required by the money laundering statutory provisions, such circular reasoning is unavailing under the circumstances presented here. It has been established by the Court of Appeals for this circuit that [HN21]the underlying offense element of Sections 1956 and 1957 must be distinct from the money laundering allegation itself. See, e.g., United States v. Szur, 289 F.3d 200, 213-14 (2d Cir. 2002) ("'It matters only that the predicate offense has produced proceeds in transactions distinct from those transactions allegedly constituting money laundering.'") (quoting United States v. Mankarious, 151 F.3d 694, 706 (7th Cir. 1998)) (emphasis omitted); United States v. McCarthy, 271 F.3d 387, 395 (2d Cir. 2001) ("Our case law consistently distinguishes between the crime that produces proceeds and the subsequent crime of laundering those proceeds, even though the transactions may flow together."). While it is conceivable that a specific and sufficiently pled money laundering offense could

serve as a predicate "specified unlawful activity" [*31]  for a second, separate instance of money laundering, W79's complaint offers no factual allegations suggesting that such a situation is present here.

In the absence of adequate allegations as to the existence of a specified unlawful activity, W79 has failed to adequately plead money laundering as a predicate racketeering activity with regard to its civil RICO claim. See generally Casio Computer Co. v. Sayo, 2000 U.S. Dist. LEXIS 15411, No. 98 Civ. 3772 (WK), 2000 WL 1877516, at *16-17 (S.D.N.Y. Oct. 13, 2000) [HN22](observing that, while a plaintiff need not allege money laundering with great particularity where the money laundering is not premised on fraud, a plaintiff "must plead all elements of the offense" in order to adequately plead money laundering as a predicate act under RICO and withstand motions to dismiss) (citing Bernstein v. Misk, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997)).

#### 4. Tax Fraud and Violations of State Law

W79's complaint is peppered with allegations that Defendants violated additional federal and state laws, including the claim that Defendants "avoided tax obligations under the Internal Revenue Code, New York State tax laws, and violated New York law, [*32]  including but not limited to the Martin Act and other state and local laws prohibiting the illegal operation of a hotel as well as the Declaration and By-Laws and Certificate of Occupancy for the Cond-op." (Compl. at P 105.) Insofar as W79 may be relying on these allegations in a manner distinct from their role with regard to its mail and wire fraud claim, the complaint fails to identify any grounds upon which it could be concluded that the alleged violations constitute predicate racketeering activities under 18 U.S.C. § 1961(1).

#### B. W79 Has Not Otherwise Adequately Pled a Section 1962(a) Claim

The Court of Appeals for the Second Circuit has held that [HN23]a violation of section 1962(a),

> consists of investing income derived from a pattern of racketeering activity to acquire an interest in, establish, or operate an enterprise; the violation is not established by mere participation in predicate acts of racketeering. Accordingly, under the plain terms of the statute ... for a violation of § 1962(a) [to occur], a plaintiff must allege injury "by reason of" defendants' investment of racketeering income in an enterprise.

*Ouaknine*, 897 F.2d at 82-83 [*33]   (citations omitted). "[A] violation of this section is not established by showing participation in the alleged pattern of racketeering activity, or the derivation of income from that pattern, but is established instead by showing the use or investment of that income in acquiring, establishing or operating an enterprise." *Zaro Licensing*, 779 F. Supp. at 283; *see also Ouaknine*, 897 F.2d at 83 ("The essence of a violation of § 1962(a) is not commission of predicate acts but investment of racketeering income."). "The 'by reason of' language in the context of a section 1962(a) violation requires that the alleged injury must have been caused by the investment of the racketeering proceeds." *Blue Cross & Blue Shield*, 113 F. Supp. 2d at 383 (emphasis omitted) (collecting cases).

[HN24]To allege an investment injury under Section 1962(a), a plaintiff must plead two elements: "first, that the defendants used or invested racketeering income to acquire or maintain an interest in the alleged enterprise, and second, that the plaintiff[] suffered an injury as a result of that investment by the defendants." *Allen v. New World Coffee, Inc.*, 2002 U.S. Dist. LEXIS 4624, No. 00 Civ. 2610 (AGS), 2002 WL 432685, [*34] at *2 (S.D.N.Y. Mar. 19, 2002) (internal quotations omitted); *see also Pyke v. Laughing*, 1998 U.S. Dist. LEXIS 884, No. 92 Civ. 555, 1998 WL 37599, at *2 (N.D.N.Y. Jan. 26, 1998). "Failure to satisfy this two part test will result in the dismissal of the plaintiffs' claims." *Protter v. Nathan's Famous Sys., Inc.*, 925 F. Supp. 947, 954 (E.D.N.Y. 1996) (citing *R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 642 (S.D.N.Y. 1995)).

Even assuming, *arguendo*, that W79 had adequately pled that Defendants derived income from a pattern of racketeering activity -- which pattern of racketeering activity, as set forth above, W79 has failed to establish -- W79 has not adequately alleged that it sustained an investment injury. [HN25]Under Section 1962(a), the investment injury alleged must be distinct from any injury arising from the predicate racketeering acts themselves. *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128, 142 L. Ed. 2d 510, 119 S. Ct. 493 (1998); *Ouaknine*, 897 F.2d at 82-83; *USA Certified Merchants*, 262 F. Supp. 2d at 331; *Blue Cross & Blue Shield*, 113 F. Supp. 2d at 383-84. [*35]

Moreover, [HN26]"the injury causation requirement of § 1962(a) is not satisfied by allegations that a defendant, which is also the enterprise, invested the racketeering income in its general operations." *Katzman*, 167 F.R.D. at 657. "As a matter of law, reinvestment of racketeering income is insufficient to make out a cause of action under RICO." *Allen*, 2002 U.S. Dist. LEXIS 4624, 2002 WL 432685, at *4. This is so because, "'where re-

investment of racketeering proceeds back from the same RICO enterprise is alleged, the injuries stem proximately not from the investment, but from the predicate acts that make up the racketeering activity.'" *Blue Cross & Blue Shield*, 113 F. Supp. 2d at 384 (quoting *Falise v. American Tobacco Co.*, 94 F. Supp. 2d 316, 349 (E.D.N.Y. 2000)); *see, e.g., Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir. 1993) ("We have recognized repeatedly that . . . the use and investment of racketeering income [to] keep[] the defendant alive so that it may continue to injure plaintiff . . . is insufficient to meet the injury requirement of section 1962(a)."); *Soberman v. Groff Studios Corp.*, 1999 U.S. Dist. LEXIS 8075, No. 99 Civ. 1005 (DLC), 1999 WL 349989, [*36] at * 5 (S.D.N.Y. June 1, 1999) (observing that "allegations that money was used or invested to further the same scheme are insufficient [to state a claim under section 1962(a)], since they do not allege a distinct [investment] injury"); *Kaczmarek v. IBM Corp.*, 30 F. Supp. 2d 626, 628 (S.D.N.Y. 1998) ("Mere reinvestment of racketeering income into the same racketeering enterprise that generated the income 'does not satisfy the Second Circuit's holding in *Ouaknine*' because 'investment of the proceeds from the pattern of racketeering for general operations is too attenuated a causal connection to satisfy section 1962(a) and 1964(c).' Under these circumstances, the real cause of the injury remains the racketeering acts, not the investment of the proceeds in the enterprise."); *accord USA Certified Merchants*, 262 F. Supp. 2d at 331; *Protter*, 925 F. Supp. at 954.

W79's complaint alleges that "each Defendant and/or the Babad Enterprise [all Defendants take part] received income directly or indirectly from a pattern of racketeering activity, and used or invested, directly or indirectly, part of such income, or the proceeds of such [*37]   income in KMC, Babad Management, Signature, Metro-Home, Hospitality and/or the Babad Enterprise, an enterprise which is engaged in operations which affect interstate commerce." (Compl. at P 117.) As set forth above, [HN27]allegations that income derived directly or indirectly from the purported racketeering activity was reinvested into the same enterprise allegedly responsible for that activity are insufficient as a matter of law to sustain a Section 1962(a) claim. *See Katzman*, 167 F.R.D. at 657 (holding that a failure to allege an investment injury bars a Section 1962(a) claim).

In an effort to avoid this conclusion, W79 suggests that Signature and Metro-Home provide rentals for corporate housing and hotel space in New York City other than those located at The Atrium and that, by reinvesting the "illicitly gained proceeds" obtained through their purported racketeering activities into "those aspects" of their businesses engaged in "legitimate hotel operations," Signature and Metro-Home are investing their racketeer-

ing income in something other than the RICO enterprise. (Pl. Opp. Mem. at 40-41.) Similarly, W79 argues that proceeds from the purported racketeering are allocated [*38] to KMC and that these proceeds are not reinvested into the RICO activities.

As an initial matter, this argument is somewhat contradicted by allegations elsewhere in the complaint that "monies misappropriated from the illegal hotel business through the predicate racketeering activities were used or invested by Defendants in order to further finance the unlawful venture" (Compl. at P 106) and that Defendants have invested the purportedly illicit income "to acquire, establish and/or operate the Babad Enterprise." (*Id.* at P 99). Even if that were not the case, however, W79's argument does not undermine the conclusion that an investment injury has not been sufficiently pled. If Signature and Metro-Home each had both "legitimate" and "illicit[]" operations as W79 suggests, W79 has pointed to no authority for the proposition that reinvestment in an entity that purportedly conducts both legitimate and racketeering activities will satisfy Section 1962(a)'s requirement that the investment injury stem from investment in a "separate, legitimate entity." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259, 127 L. Ed. 2d 99, 114 S. Ct. 798 (1994) [HN28](explaining that the "enterprise" [*39] referred to in Section 1962(a), unlike the "enterprise" of Section 1962(c), is "not intended to be the vehicle through which a pattern of racketeering is undertaken, but a separate, legitimate entity purchased through monies raised through racketeering"). W79's allegations concerning KMC fail on a similar rationale.

As W79 has not adequately alleged an investment injury, as required under Section 1962(a), it has failed to state a claim with regard to that Section. *See Ouaknine*, 897 F.2d at 82-83 (affirming the trial court's dismissal under Rule 12(b)(6), Fed. R. Civ. P., of a claimed violation of Section 1962(a) where the plaintiff had not alleged injury from the defendants' investment of racketeering income, as [HN29]"the essence of a violation of § 1962(a) is not commission of predicate acts but investment of racketeering income").

## C. W79 Has Not Otherwise Adequately Pled a Section 1962(c) Claim

Even had W79 adequately pled predicate acts on the part of all Defendants, W79's claim under Section 1962(c) fails for two separate reasons.

First, [HN30]Section 1962(c) imposes liability only upon defendants who operate or manage [*40] RICO enterprises. *See Reves v. Ernst & Young*, 507 U.S. 170, 179, 122 L. Ed. 2d 525, 113 S. Ct. 1163 (1993) ("Some part in directing the enterprise's affairs is required"). To satisfy Section 1962(c)'s requirement, a plaintiff must plead each defendant's participation in the "operation or management" of an enterprise. *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 347 (S.D.N.Y. 1999) (quoting *Reves*, 507 U.S. at 183); *Jordan (Bermuda)*, 154 F. Supp. 2d at 693. As the Second Circuit has explained,

> One is liable under RICO if he or she has "discretionary authority in carrying out the instructions of the [conspiracy's] principals," *United States v. Diaz*, 176 F.3d 52, 93 (2d Cir. 1999), or "played some part in directing the affairs" of the RICO enterprise, *De Falco v. Bernas*, 244 F.3d 286, 311 (2d Cir. 2001); *see also United States v. Miller*, 116 F.3d 641, 673 (2d Cir. 1997); *Napoli v. United States*, 45 F.3d 680, 681-83 (2d Cir. 1995).

*Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003). "RICO liability may not be imposed on a defendant who merely carries [*41] on its own professional activities." *Dietrich*, 76 F. Supp. 2d at 347.

W79 argues that it need not show that each Defendant controlled the other in the operation of the purported enterprise, but need only demonstrate that each Defendant exerted "some degree of control over the enterprise itself, not the people associated with it . . . as 'an enterprise is operated not just by upper management but also by lower-run participants in the enterprise who are under the direction of upper management.'" *Am. Arbitration Ass'n v. DeFonseca*, 1996 U.S. Dist. LEXIS 9160, No. 93 Civ. 2424 (CSH), 1996 WL 363128, at *5 (S.D.N.Y. June 28, 1996) (quoting *Reves*, 507 U.S. at 184) (internal quotation marks omitted). In other words, according to W79, the complaint "must only state that [Defendants] were in charge of certain aspects of the enterprise." *DeFonseca*, 1996 U.S. Dist. LEXIS 9160, 1996 WL 363128, at *5.

[HN31]There is a meaningful difference "between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient . . . because the test is not involvement but control." *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 466 (S.D.N.Y. 1996). [*42] The Signature Defendants and the Metro-Home Defendants argue that their alleged involvement in the purported enterprise was minimal and does not rise to the level of control necessary for W79 to sustain a Section 1962(c) claim. The Signature Defendants argue that the only involvement they are alleged to have had with the purported enterprise is that they marketed and leased apartments in The Atrium via the internet and used an apartment in The Atrium. Similarly, the

Metro-Home Defendants point out that the complaint's only factual allegations with regard to their involvement in the supposed enterprise consist of the claim that Metro-Home engaged in the business of renting and sub-letting apartments located in The Atrium and other buildings.

[HN32]Merely rendering services to an alleged enterprise does not establish that a person or entity controls the enterprise for purposes of Section 1962(c). *See, e.g., Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994) (declining to hold an attorney liable where the plaintiffs had failed to produce anything to contradict the attorney's assertion that he was merely acting as an attorney and "had no role in the conception, creation, [*43] or execution of the purported flip/assignment" at the heart of the alleged RICO violation), *abrogation on other grounds recognized by Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 636 (S.D.N.Y. 1999); *Casio Computer*, 2000 U.S. Dist. LEXIS 15411, 2000 WL 1877516, at *21 ("Thus, 'simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.'") (quoting *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1090 (S.D.N.Y. 1996)) (internal quotation marks and citation omitted and alteration in original); *Hayden v. Paul, Weiss, Rifkind Wharton & Garrison*, 955 F. Supp. 248, 254 (S.D.N.Y. 1997) (declining to hold an accountant liable under Section 1962(c), as "it is well established that the provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO") (collecting cases). In other words, the "simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is 'insufficient' to bring a defendant [*44] within the scope of § 1962(c)." *United States v. Viola*, 35 F.3d 37, 40-41 (2d Cir. 1994), *recognized as abrogated on other grounds, United States v. Zichettello*, 208 F.3d 72, 99 n.13 (2d Cir. 2000); *accord United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999); *but cf. United States v. Allen*, 155 F.3d 35, 42 (2d Cir. 1998) (noting that the decisions of the Court of Appeals for the Second Circuit have not always consistently followed the principle set forth in *Viola*).

W79's complaint contains no factual allegations concerning the degree of discretionary authority exercised by the Signature Defendants or the Metro-Home Defendants and no allegations establishing the degree of control either group of Defendants exercised over the purported enterprise. That Alon and Blake may exercise control over Signature and Coughlin exercise similar control over Metro-Home does not establish that Alon, Blake or Coughlin, much less Signature or Metro-Home, exercised control over the supposed enterprise, nor is the

conclusory allegation that Alon, Blake and Coughlin controlled or participated directly in the enterprise alleged ( [*45] *see* Compl. at P 116) sufficient without any attending factual allegations offered to support the claim. Likewise, allegations that the Signature Defendants and the Metro-Home Defendants performed tasks that, it will be assumed for the sake of argument, were both necessary and helpful to the alleged enterprise are not sufficient, by themselves, to bring these Defendants within the scope of Section 1962(c). In short, W79's complaint fails to allege how the Signature Defendants and the Metro-Home Defendants enjoyed discretionary authority or otherwise controlled the purported enterprise in any manner that might distinguish them from an outside provider of professional services working at the behest of a client. Absent such an allegation, W79's Section 1962(c) claim against those Defendants fails.

W79's Section 1962(c) claim also fails as to all Defendants insofar as the complaint does not adequately allege that Defendants' purported predicate activity was the cause of W79's alleged injury.

[HN33]To state a civil RICO claim under Section 1962(c), the plaintiff must allege injury resulting from "defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. [*46] " *Azrielli*, 21 F.3d at 520 (internal quotation marks omitted); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). The RICO statute "limits standing to plaintiffs whose injuries were both factually and proximately caused by the RICO violation." *In re Am. Express Co. Shareholder Litig.*, 39 F.3d 395, 399 (2d Cir. 1994); *see also Ideal Steel Supply*, 373 F.3d at 257 ("The requirement in § 1964(c) that a civil RICO plaintiff show that it was injured in its business or property 'by reason of' the defendant's RICO violation means that the plaintiff must plead and prove that the violation not only was the logical, or 'but for,' cause of the injury but also was its legally cognizable, or proximate, cause."). As the Court of Appeals for the Second Circuit has recently explained,

> The requirement that a defendant's actions be the proximate cause of a plaintiff's harm represents a policy choice premised on recognition of the impracticality of asserting liability based on the almost infinite expanse of actions that are in some sense causally related to an injury.

*Ideal Steel Supply*, 373 F.3d at 257 [*47] (citing *Sperber v. Boesky*, 849 F.2d 60, 63-65 (2d Cir. 1988) (concluding that the plaintiffs' injuries were not proxi-

mately caused by the defendant's insider trading, as the plaintiffs were "neither the target of the racketeering enterprise nor the competitors nor the customers of the racketeer")); *see also Vicon Fiber Optics Corp. v. Scrivo, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2000)* ("A predicate act does not proximately cause an injury if it merely furthers, facilitates, permits or conceals an injury that happened or could have happened independently of the act.").

Even if W79 had adequately alleged a pattern of racketeering activity by Defendants, W79 has not set forth how the various injuries it has alleged are the logical and proximate result of Defendants' conduct. W79 has alleged that the purported hotel operated by Defendants "damages the interests of W79 as owner of the Commercial Unit" (Compl. at P 86) because, as a result of the purported hotel operation, there is "increased wear and tear, thus causing the Defendants to charge higher maintenance fees, [passed on to] W79 in the form of common charges" (*id.* at P 87), and to pass on expenses [*48]  such as maid service and towel service to W79. (*See id.* at P 88). These alleged injuries are too remote to constitute injuries directly resulting from any alleged racketeering activity.

W79 further alleges that it has been "forced to incur the expense of over $ 1 Million in infrastructure improvements and repairs, which . . . inure to the benefit of all Defendants" (*id.* at P 90), and that the value The Atrium has been diminished due to the purported hotel operation. (*See id.* at P 91). Both of these claims are similarly wanting, as they fail to establish that Defendants' activities are both the "but for" cause and the proximate cause of W79's injuries. Indeed, although W79 alleges that it has been "forced" to incur certain expenses, the complaint does not set forth how or under what circumstances W79 was forced to incur such expenses which, according to the complaint, were distinct from the common charges assessed. (*See id.* at P 145.) Moreover, the complaint alleges predicate racketeering activity relating to the purported hotel operation from "at least September 2003" (*id.* at P 107) and does not specify when the expense of $ 1 million was incurred, raising doubt [*49]  as to the causation of that expense, doubt underscored by the Board Defendants' unrefuted assertion in their moving papers that the expense at issue was incurred in 1997.

Finally, W79 alleges that it has been injured by the purported hotel operation "in that the Babad Enterprise uses W79's apartment to run its hotel housekeeping service, thereby interfering with W79's property rights and depriving W79 of its rental income." (*Id.* at P 89.) W79 elsewhere alleges that it has been injured with regard to the apartment in question "as a direct and proximate result" of Defendants' trespass (*id.* at P 153), casting doubt

on any claim that its injury is directly and proximately caused by any predicate racketeering activity.

In sum, the facts alleged in the complaint fail to set forth that Defendants' predicate activity was the cause of W79's alleged injury, and W79's *Section 1962(c)* allegations thus fail to state a claim.

### D. *W79 Has Not Adequately Pled a Section 1962(d) Claim*

[HN34]*Section 1962(d)* prohibits any person from conspiring to violate any of the substantive provisions of *Sections 1962(a)*, *1962(b)* and *1962(c)*. As one court has explained,

> In order to establish [*50]  a violation of *§ 1962(d)*, the Supreme Court has held that a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense ... [.]" In other words, a RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met.

*Citadel Mgmt.*, 123 F. Supp. 2d at 156 (quoting *Salinas v. United States, 522 U.S. 52, 65, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997)*; *see also Jordan (Bermuda)*, 154 F. Supp. 2d at 695 ("To withstand a motion to dismiss, a RICO conspiracy allegation must 'display[] the continuity necessary to support a substantive RICO violation,' or an agreement to perform other predicate acts that, if carried out, would have established the requisite 'pattern of racketeering activity.'") (quoting *Cofacredit*, 187 F.3d at 245); *Falise*, 94 F. Supp. 2d at 353 ("Any claim under *section 1962(d)* based on conspiracy to violate the other subsections of *section 1962* necessarily must fail if the substantive claims are themselves deficient.").

W79's [HN35]"failure to adequately plead facts that would satisfy [*51]  the pleading requirements of *§§ 1962(a) . . . or 1962(c)* necessarily dooms any claim [it] might assert arising under *§ 1962(d)*." *Katzman*, 167 F.R.D. at 658; *see also Dietrich*, 76 F. Supp. 2d at 349-50 (dismissing a claim under *§ 1962(d)* because the amended complaint failed to adequately plead substantive violations of other RICO subsections).

### E. *Leave to Replead Is Denied*

W79's complaint fails to set forth a RICO claim upon which relief can be granted. W79 has requested, in the event that its RICO claim is found wanting, leave to replead. (*See* Pl. Opp. Mem. at 53.)

[HN36]In general, leave to replead should be "freely given when justice so requires." *Fed. R. Civ. P. 15(a)*;

see also *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991). Notwithstanding this liberal practice, leave to replead may be denied if repleading would be futile. See *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("Where it appears that granting leave to amend is unlikely to be productive, . . . it [*52] is not an abuse of discretion to deny leave to amend.") (internal quotation marks omitted); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (*per curiam*). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*." *Lucente*, 310 F.3d at 258 (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)).

Permitting W79 to replead its RICO claim is unlikely to be productive, as this claim suffers from substantive and not mere technical deficiencies for the multiple reasons set forth above and W79 has offered no indication that it could replead its RICO claim in a manner adequate to correct these deficiencies. Accordingly, W79's RICO claim is dismissed with prejudice.

## II. *Supplemental Jurisdiction*

As Defendants' motions to dismiss are being granted with respect to the sole claim in W79's complaint over which this Court had original jurisdiction, it must be determined whether a continued [*53] exercise of supplemental jurisdiction over W79's remaining state-law claims is appropriate.

[HN37]The fact that the remaining claims in this action arise under state law does not require automatic dismissal for lack of subject matter jurisdiction. To the contrary, "'the district court may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction, [although] it cannot exercise supplemental jurisdiction unless there is first a proper basis for original federal jurisdiction.'" *Parker v. Della Rocco*, 252 F.3d 663, 666 (2d Cir. 2001) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)). The statutory authority for the exercise of such supplemental jurisdiction is found in *28 U.S.C. § 1367(c)(3)*, according to which a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction," as is the case here. *28 U.S.C. § 1367(c)(3)*.

Nonetheless, "in general, where the federal claims are [*54] dismissed before trial, the state claims should be dismissed as well." *Marcus v. AT & T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) (citing *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994); *Baylis v. Marriott Corp.*, 843 F.2d 658, 664-65 (2d Cir. 1988)); see also *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 98 L. Ed. 2d 720, 108 S. Ct. 614 (1988) ("In the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1222 (S.D.N.Y. 2002) (declining to exercise supplemental jurisdiction and noting that "this is the preferred course when all federal claims have been dismissed pre-trial," particularly where "difficult issues of state law more appropriately [*55] addressed to the state courts" are at stake); *Louis v. St. Luke's Roosevelt Hosp. Ctr.*, 2002 U.S. Dist. LEXIS 13463, No. 01 Civ. 11400 (RWS), 2002 WL 1684175, at *3 (S.D.N.Y. July 24, 2002) (noting the "well-established rule of dismissing pendent state and municipal claims where the federal claim providing jurisdiction has been dismissed").

As there is no longer any claim brought under federal law in this action and with due consideration of concerns of judicial economy, convenience and fairness, pursuant to *28 U.S.C. § 1367(c)(3)*, this Court declines to exercise supplemental jurisdiction over W79's remaining claims. See *Gilmore v. Amityville Union Free School Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004) (declining to exercise supplemental jurisdiction where federal claims had been dismissed); see also *Block v. First Blood Assocs.*, 988 F.2d 344, 351 (2d Cir. 1993) (concluding that, even though "courts adjudicating cases similar to plaintiffs' have declined to dismiss pendent claims after the federal claims were dismissed," the district court did not abuse its discretion by "refusing to exercise pendent jurisdiction over plaintiffs' [*56] state law claims when their federal claims were dismissed before trial"). Accordingly, W79's remaining claims are dismissed without prejudice, and the Court need not reach the Metro-Home Defendants' argument for dismissal of W79's trespass claim against them.

## Conclusion

For the reasons stated above, W79's claim for civil RICO violations is dismissed with prejudice, the remaining claims are dismissed without prejudice, and this case is closed.

It is so ordered.

**New York, NY**

**September 29, 2004**

2004 U.S. Dist. LEXIS 19501, *

**U.S.D.J.**

**ROBERT W. SWEET**

# EXHIBIT 2 TO NOTICE OF MOTION

Jeffrey I. Carton
Jerome Noll
MEISELMAN, DENLEA, PACKMAN,
CARTON & EBERZ P.C.
1311 Mamaroneck Avenue
White Plains, New York 10605
(914) 517-5000
Attorneys for Plaintiffs



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GABRIELA CARMONA and EDNA SEPULVEDA,          Civ. No. 08-4475 (LAK) (GWG)
on behalf of themselves and all
others similarly situated,                    **FIRST AMENDED CLASS**
                                              **ACTION COMPLAINT**

                              Plaintiffs,

                  -against-                   **Jury Trial Demanded**

SPANISH BROADCASTING SYSTEM, INC. and
ALL STAR VACATION MARKETING GROUP, INC.,

                              Defendants.
-------------------------------------------------------------------X

Plaintiffs, Gabriela Carmona and Edna Sepulveda, by their attorneys,

Meiselman, Denlea, Packman, Carton & Eberz P.C., as and for their verified first

amended class action complaint, allege, with personal knowledge as to their own

actions, and upon information and belief as to those of others, as follows:

## Nature of this Case

1.    This action seeks to redress a deceptive and otherwise improper business

practice that Defendants Spanish Broadcasting System, Inc. ("SBS") and All Star

Vacation Marketing Group, Inc. ("All Star") are perpetrating upon unsuspecting listeners

of "97.9 La Mega FM" and "93.1 Amor FM;" specifically, bogus radio station contests in

which listeners are purposefully misled to believe that they have won an all expense

paid, all inclusive trip to various locations in the United States, Mexico or the Carribean.

2. Despite deceiving listeners to participate in, among other things, a "trivia contest" for which the correct answer will purportedly win them an all-expense paid trip to a vacation destination of their choice, the "contest" Defendants are running is merely a ruse to lure unsuspecting consumers to be charged exorbitant "administrative fees," fake "taxes," and other costs associated with the purportedly free trip they are enticed to believe they have won.

3. In fact, the trip that listeners have "won" is anything but free. Although consumers are told repeatedly by Defendants that the trip is an all expense paid, all inclusive trip to an exotic locale, they are never told that they must pay a fee in the amount of $399.00, or that airfare is not included as part of their "all inclusive" trip.

4. Thus, as a result of Defendants' deceptive and improper actions, New York and New Jersey radio listeners, such as Plaintiffs, have been duped into participating in a contest and travel scam, resulting in Defendants' improper and unlawful monetary gain and benefit.

5. This suit is brought, pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq., New York General Business Law § 349, New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., and the common law, on behalf of a class of all persons who have called Defendant All Star at the behest of Defendant SBS and have been charged a fee for a trip they have "won." It seeks, inter alia, compensatory damages, including, but not limited to, a refund of all fees charged to callers; reimbursement of airfare expenses incurred by class members as a result of Defendants' scheme; attorneys' fees; and the costs of this suit.

2

## Jurisdiction and Venue

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. This is an action for violation of 18 U.S.C. §§ 1961 et seq.

7.      Jurisdiction in this civil action is also authorized pursuant to 28 U.S.C. § 1332(d), as at least one Plaintiff has diverse citizenship from at least one Defendant, there are more than 100 class members, and the amount in controversy is in excess of $5 million.

8.      In addition, jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(a)(1), as this matter is between citizens of different states and complete diversity exists, and the amount in controversy is in excess of $75,000.00.

9.      This Court has supplemental jurisdiction over Plaintiff's state and common law causes of action, including claims based on violations of New York General Business Law § 349, New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., and the common law of the States of New York and New Jersey, pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in the Southern District of New York.

11.     Venue is also proper in this district under 28 U.S.C. § 1391(a)(2), on the grounds that a substantial part of the events relating to Plaintiff's claims occurred in the Southern District of New York.

12.     Venue is additionally proper in this district under 18 U.S.C. § 1965(a), as Defendant SBS's two New York radio stations are located in the Southern District of

3

New York, and Defendant SBS has designated New York County, which is located in the Southern District of New York, with the New York State Department of State as the county in New York State where its principal office is located.

## Parties

13. Plaintiff Gabriela Carmona ("Plaintiff Carmona" or "Carmona") is a citizen and resident of the State of New York, County of Queens. Ms. Carmona was deceived by Defendants into paying a $399.00 fee for an "all inclusive" and "all expense paid" trip she was told she had won in a radio contest.

14. Plaintiff Edna Sepulveda ("Plaintiff Sepulveda" or "Sepulveda") is a citizen and resident of the State of New Jersey, County of Hudson, and a federal law enforcement officer. Ms. Carmona was deceived by Defendants into paying a $399.00 fee for an "all inclusive" and "all expense paid" trip she was told she had won in a radio contest.

15. Defendant Spanish Broadcasting System, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in Coconut Grove, Florida.

16. Defendant SBS does actual business throughout the States of New York and New Jersey, including through operating two radio stations broadcasting in both States -- 97.9 FM and 93.1 FM -- and maintenance of interactive websites -- *lamega.com* and *931amor.com* -- accessible to consumers in, and residents of, both States.

17. Defendant All Star Vacation Marketing Group, Inc. is a corporation established under the laws of the State of Florida, with its principal place of business

4

located in Miami, Florida.

18.    Defendant All Star does actual business throughout the States of New York and New Jersey, including through the promotion and sale of vacation packages to New York and New Jersey State residents, and through the maintenance of two interactive websites – *allstarvacation.net* and *nextleveltours.com* – accessible to consumers in, and residents of, both States.

## Operative Facts

19.    Defendant SBS is the largest publicly traded Hispanic controlled media and entertainment company in the United States. SBS owns and operates twenty radio stations in the United States, including Mega 97.9 FM and Amor 93.1 FM located in New York, both of which broadcast throughout New York's five boroughs, surrounding counties and in certain areas in the State of New Jersey.

20.    Defendant All Star Vacation Marketing Group, Inc. is a privately held corporation based in Miami, Florida, promoting tour and vacation packages to various destinations in the United States, Mexico, Dominican Republic and the Caribbean. Defendant All Star targets the Hispanic community through Spanish language radio stations and websites. It does business under a variety of names, including Next Level Tours and Solgaval.

### A.    Plaintiff Gabriela Carmona

21.    On or about Sunday afternoon, April 13, 2008, Plaintiff Carmona and her fiancé, Luis Briones, were driving in his car in New York listening to Disk Jockey Pulito Vega ("DJ Vega") broadcasting on 97.9 "La Mega" FM ("La Mega").

5

22.    While Plaintiff Carmona was in her fiance's car, she heard DJ Vega announce a contest. The prize to be awarded to each winner of the contest, DJ Vega said, was an all expense paid and "all included" ("todo incluido") trip to either Punta Cana, Las Vegas, Orlando or Mexico.

23.    DJ Vega then introduced to his listening audience "my friend Alfredo" ("mi amigo Alfredo"). DJ Vega explained that the contest was being made available to La Mega's audience in collaboration with "Alfredo" and "the tour operator," and that they would be in charge of all of the travel arrangements once the contest winners were announced.

24.    As Alfredo explained, the first 35 callers to answer correctly the question "Where is Ruben Blades from?" will go ("se van") either to Punta Cana, Las Vegas, Orlando or Mexico. The winner would be able to chose the travel destination once she or he had won the contest.

25.    DJ Vega and Alfredo, however, failed to disclose to La Mega's listeners that Alfredo was a representative of Defendant All Star, and that the "tour operator" was Defendant All Star doing business as "Next Level Tours."

26.    The contest promotion lasted approximately 60 minutes, with DJ Vega and Alfredo stating over and over again, between songs and commercials, that "no callers are getting the correct answer." DJ Vega, along with Alfredo, urged all listeners to keep calling the phone number they were giving out as no one had yet called in with the correct answer.

27.    During the entire time the contest was airing, DJ Vega and Alfredo repeatedly and enthusiastically implored La Mega's listeners with the prize at hand: an

6

all inclusive, all expense paid vacation to "exotic" and "exciting" locales in the United States, Dominican Republic and Mexico. Both DJ Vega and Alfredo repeated, over and over again, the fact that the winner of the contest would be winning an "all inclusive" and "all expense paid" trip, and that a dream vacation could be won by any listener calling in with the correct answer.

28.     Throughout the 60 minutes or so that the contest was in effect, DJ Vega did not, at any point, state that any listener had called in with the correct answer. In fact, DJ Vega continued to urge his listeners to call the number given out by him and Alfredo, and continued to tell his listeners that no one had yet won the "all inclusive" ("todo incluido") trip. As such, throughout this specific radio segment, DJ Vega urged as many listeners as possible to participate in the "contest."

29.     Plaintiff Carmona, sitting in her fiance's car in New York and listening attentively at this point for almost 60 minutes, was surprised that no one had yet answered the question correctly. The answer to the contest question was not difficult to ascertain, and Ms. Carmona knew the answer. And because DJ Vega and Alfredo continued to insist – for at least 60 minutes – that no one had called in with the correct answer, Ms. Carmona decided that she would call and attempt to win an "all inclusive" and "all expense paid" trip.

30.     Using her cell phone, Plaintiff Carmona dialed the phone number being given out over the radio. Based on DJ Vega's exhortations to his listeners to keep calling the number which was being given out over the radio, Ms. Carmona believed she was calling La Mega's switchboard in order to answer the contest question and win her trip.

7

31.   In fact, the phone number Plaintiff Carmona was told to call connected her not to the radio station, but to Defendant All Star Vacation Marketing Group, Inc., doing business as Next Level Tours, in Orlando, Florida.

32.   Upon calling the number, a woman answered the phone and exclaimed to Plaintiff Carmona: "Congratulations ! You're the winner." ("Felicidades, eres la ganadora"). At that point, Ms. Carmona lost cell phone reception and the call was dropped. Within minutes she was able to regain cell phone coverage and called the number a second time. Once again, the person answering the phone immediately exclaimed: "Congratulations ! You're the winner." Plaintiff Carmona explained that she had just called but had been disconnected. The woman answering the phone asked Ms. Carmona for her cell phone number and told her that she should expect a return phone call within 15-20 minutes.

33.   Plaintiff Carmona was never asked during the first or second phone calls whether or not she knew the answer to the contest question, nor was she told that she was speaking to Defendant All Star, a tour operator based in Florida.

34.   Approximately 15 minutes after Plaintiff Carmona placed her second call, she received a return call on her cell phone. This person immediately asked Ms. Carmona where she would like to go on her free trip: Punta Cana, Las Vegas, Orlando or Mexico?

35.   At this point, not having been asked if she knew the answer to the contest question, Plaintiff Carmona requested the name of the person to which she was speaking. The person responded that Ms. Carmona was speaking to "Next Level Tours," the company responsible for "administering" the trip Ms. Carmona had just won.

8

36.    Plaintiff Carmona was asked again where she wanted to go on her "all inclusive" trip.  Before Ms. Carmona had a chance to respond, the Next Level Tour representative reassured Ms. Carmona that whatever destination she did choose, all expenses were prepaid and the hotel was all-inclusive.

37.    The Next Level Tour representative promised, almost word for word, what DJ Vega and Alfredo were promising La Mega's listeners at that very moment: that callers would win an "all inclusive" and "all expense paid" trip to a destination of their choice.

38.    Upon hearing identical promises from three separate persons (DJ Vega, Alfredo and the customer representative on the phone) Plaintiff Carmona chose the "all expense paid" trip to Punta Cana.

39.    After providing her full name, address, and her age, Ms. Carmona was told that their would be a $399 "administrative fee" for the trip.  She was assured that this was the only charge she would pay, and that every other expense associated with the trip was covered, and that the trip was "all inclusive."

40.    Upon being reassured that the $399 fee was the sole fee to be paid, Plaintiff Carmona gave the customer representative her credit card number, and was charged the fee.  Upon confirmation that the fee had been approved by Ms. Carmona's credit card company, she was told to expect to receive by mail within two to three weeks all the "paperwork" related to the trip.  Ms. Carmona was also given a "confirmation number."

41.    After hanging up, Plaintiff Carmona spoke to her fiancé.  He pointed out that it didn't seem right that she had to pay a hidden administrative fee if she had

9

indeed won an all expense paid trip. Ms. Carmona decided to call back to inquire further regarding the details of the trip.

42.     Upon calling a fourth time, the person answering the phone again immediately exclaimed: "Congratulations ! You're the winner." Plaintiff Carmona explained that she had called previously and had already "won" a trip to Punta Cana. She was calling back because she had questions about the details of the trip she had won. At that point, the customer representative transferred Ms. Carmona to another person who she said would answer all of Ms. Carmona's questions. Plaintiff Carmona was transferred to Mr. Cesar Nevado, a "supervisor" at Next Level Tours.

43.     Ms. Carmona first asked Mr. Nevado which airline she would be flying to Punta Cana. She was stunned to hear Mr. Nevado respond that airfare was not included in her "all expense paid" trip. In fact, Mr. Nevado said, "you need to make your own arrangements for airfare and pay for it yourself." Ms. Carmona then asked for the name of the hotel in Punta Cana in which she would be staying. Mr. Nevado answered that she would be staying at the Sol Melia Hotel and, "not to worry," the hotel was "all inclusive." She was also told that the trip was for 5 days and 4 nights and that reservations must be made thirty days in advance of the departure date. Plaintiff Carmona, stunned that she had just paid $399 for an "all inclusive" and "all expense paid" trip which did not include airfare, ended the call.

44.     It was at that point that Ms. Carmona realized that she was a victim of a travel scam, implemented in conjunction with DJ Vega and 97.9 La Mega's fake "contest." It was obvious that there was no contest per se, and that everyone calling was a "winner," as long as they paid the $399 "administrative" fee and their own airfare.

10

45.     Realizing that she was the victim of a scam, Ms. Carmona attempted to contact Next Level Tours for the fifth time (and a few more times over the next two days) in order to cancel her purportedly free trip and request a refund of the $399 fee. She was unable to obtain a refund of her money. Plaintiff Carmona was told repeatedly that Next Level Tours had a "no-refund policy" and that it was not possible to cancel her trip.

46.     On April 16, 2008, Defendant All Star caused materials to be mailed from Orlando, Florida, and delivered to Plaintiff Carmona at her home address in Rego Park, New York, by the United States Postal Service. The mailing included an invoice reflecting the $399.00 "administrative" fee charged to Ms. Carmona's credit card and further indicated that she had "won" a vacation "package" to Punta Cana for 5 days, 4 nights, and a "gift" to Orlando, Florida, for 3 days and 2 nights. Nowhere on the invoice does it state or indicate that airfare is not included for either of the trips. The mailing also included a brochure from Defendant All Star describing various travel destinations and hotels, and contact information to make reservations.

47.     Throughout this whole ordeal, Plaintiff Carmona was never asked the answer to the question she supposedly had to answer correctly to win her trip, and was never informed prior to paying the $399 "administrative" fee that airfare was not included.

48.     Moreover, she was never told what the $399 fee was for, what it covered, and what administrative fees, if any, were incurred by Defendant All Star. And because the cost of airfare to Punta Cana is expensive, Ms. Carmona cannot afford to take her purportedly free trip to Punta Cana. In fact, it would cost her literally thousands of

11

dollars to go on her "all expense paid" trip, once airfare for two (for herself and her fiancé), taxes and the $399 "administrative" fee are taken into account.

B.    Plaintiff Edna Sepulveda

49.    On or about Friday afternoon, May 2, 2008, Plaintiff Sepulveda was at home, in Jersey City, New Jersey, listening to DJ Vega broadcasting on La Mega. She heard DJ Vega announce a contest: the first ten callers to call a number being given out by him will win a "free trip" to a destination of their choice.

50.    The prize to be awarded to the first ten callers, DJ Vega said, was an all expense paid "vacation package" to either Punta Cana, Puerto Rico, Orlando or Mexico.

51.    The contest promotion lasted approximately 30 minutes, with DJ Vega stating over and over again, between songs and commercials, that "no callers were calling in to win the vacation package." As such, DJ Vega urged all listeners to keep calling the phone number he was giving out.

52.    During the entire time the "contest" was airing, DJ Vega enthusiastically described to La Mega's listeners the prize at hand: an all inclusive, all expense paid vacation to "exotic" and "exciting" locales in the United States, Dominican Republic, Puerto Rico and Mexico.  DJ Vega repeated, over and over again, the fact that the first ten callers would be winning an "all inclusive" and "all expense paid" trip, and that a dream vacation could be won by these callers.

53.    Calling from her home in New Jersey, Plaintiff Sepulveda dialed the phone number being given out by DJ Vega over the radio.  Based on DJ Vega's exhortations

12

to his listeners to keep calling, Ms. Sepulveda believed she was calling La Mega's switchboard in order to win her free trip.

54.    In fact, the phone number Plaintiff Sepulveda was told to call connected her not to the radio station, but to Defendant All Star Vacation Marketing Group, Inc., doing business as Next Level Tours, in Orlando, Florida.

55.    Upon calling the number, a woman answered the phone and exclaimed to Ms. Sepulveda: "Congratulations ! You're the winner." ("Felicidades, eres la ganadora"). The woman answering the phone told Ms. Sepulveda that her name was "Carolina," whom Plaintiff Sepulveda believed was the La Mega DJ named "Carolina." As such, Ms. Sepulveda had no doubt that she had called the radio station, when in fact she had called Next Level Tours in Florida. "Carolina" asked Ms. Sepulveda for her phone number and told her that she should expect a return phone call within 15-20 minutes.

56.    Approximately 15 minutes after Plaintiff Sepulveda placed her call, she received a return call at her home. This person, who was not "Carolina," immediately asked Ms. Sepulveda where she would like to go on her free trip: Punta Cana, Puerto Rico, Orlando or Mexico?

57.    Before Plaintiff Sepulveda had a chance to respond, the Next Level Tour representative told Ms. Sepulveda that whatever destination she did choose, all expenses were prepaid and the hotel was all-inclusive.

58.    At no point in the conversation did the Next Level Tour representative tell Plaintiff Sepulveda that airfare was not included for any of the "free" trips.

59.    Upon hearing identical promises from three separate persons (DJ Vega, "Carolina" and the male customer representative on the phone) Plaintiff Sepulveda

13

chose the "all expense paid" trip to Disney World, in Orlando, Florida. At that point, the Next Level Tours representative told Ms. Sepulveda that she had won a "bonus gift" to Puerto Rico, and that this "gift" was also free and all inclusive.

60.     After providing her full name and address, Ms. Sepulveda was told that she would have to pay "taxes" for her trip to Orlando in the amount of $399.00. She was assured that this was the only charge she would pay, and that every other expense associated with both trips were covered.

61.     Upon being reassured that the $399 was for "taxes," and that it was the sole fee to be paid, Plaintiff Sepulveda gave the customer representative her credit card number, and was charged the fee. Upon confirmation that the fee had been approved by Ms. Sepulveda's credit card company, she was told to expect to receive by mail within two to three weeks all the "paperwork" related to the trip.

62.     Before ending the call, Ms. Sepulveda asked once again if indeed all expenses had now been paid, and that she would be receiving two free trips, one to Orlando and the other to Puerto Rico.

63.     At that point, the Next Level Tours representative responded that all expenses had now been paid, "except for airfare," which "of course" was not included in her "all expense paid" trip. Shocked at what she had just heard, Plaintiff Sepulveda immediately requested a refund of the $399 fee, and pointed out with some anger that she had just been lied to repeatedly by both DJ Vega, "Carolina," and the Next Level Tours representative on the phone.

64.     Ms. Sepulveda realized immediately that she was a victim of a travel scam, implemented in conjunction with DJ Vega and 97.9 La Mega's fake "contest." It

14

was obvious that there was no contest per se, and that everyone calling, not just the first ten callers, was a "winner," as long as they paid $399 in fake "taxes" and their own airfare.

65.    Ms. Sepulveda demanded to cancel her purportedly free trip and again requested a refund of the $399 in "taxes" she had just paid.  She was unable to obtain a refund of her money.  Plaintiff Sepulveda was told that Next Level Tours had a "no-refund policy" and that it was not possible to cancel her "free" trips.

66.    On or about May 8, 2008, Defendant All Star caused materials to be mailed from Orlando, Florida, and delivered to Plaintiff Sepulveda at her home address in Jersey City, New Jersey, by the United States Postal Service.  The mailing included an invoice reflecting the $399.00 "administrative" fee charged to Ms. Sepulveda's credit card and further indicated that she had "won" a vacation "package" to Orlando for 4 days, 3 nights, and a "gift" to Puerto Rico, for 3 days and 2 nights.  Nowhere on the invoice does it state or indicate that the fee paid was for taxes (as the Next Level Tours representative stated on the phone) or that airfare is not included for either of the trips.  The mailing also included a brochure from Defendant All Star describing various travel destinations and hotels, and contact information to make reservations.

67.    Throughout this whole ordeal, Plaintiff Sepulveda was never informed prior to paying the $399 in "taxes" that airfare was not included.

68.    Moreover, because the cost of airfare to Orlando, Florida, along with tickets to Disney World, are expensive, Ms. Sepulveda cannot afford to take her purportedly free trip to Orlando and Disney World.  In fact, it would cost her literally thousands of dollars to go on her "all expense paid" trip, once airfare, Disney park

15

tickets and the $399 fee for "taxes" are taken into account.

### Defendants Engaged in a Scheme to Defraud Radio Listeners

69.     Defendant SBS's listener "contests" to win "all inclusive" and "all expense paid" trips are a scam; nothing more than an undisclosed scheme created and implemented by Defendants to deceive 97.9 La Mega's and 93.1 Amor's listeners into believing that they had won a free trip. Defendants' deception cost each caller at least $399, and airfare if they traveled to their chosen destination.

70.     The implementation of fake radio contests and assessment of a $399 "administrative" fee represents a deliberate profit-making scheme by Defendants. Defendant SBS's scam radio contests are aired in collaboration with Defendant All Star in furtherance of this scheme. In this manner, Defendants guarantee that "administrative" fees and "taxes" will provide a consistent, lucrative and substantial source of revenue.

71.     Moreover, by creating and implementing scam radio contests, Defendant SBS is able to reap untold advertising revenue, which is shared with Defendant All Star. In addition, the fraudulent fees paid by callers to Defendant All Star could not have occurred without the consent, knowledge and participation of Defendant SBS, and monies collected as a result of this deception were shared by Defendants.

72.     There have been numerous consumer complaints to various Federal and State authorities about Defendant All Star's travel scams, and web sites are full of consumers who have complained about All Star's unfair and deceptive practices. Moreover, the Attorney General of Puerto Rico has issued a cease and desist order to Defendant All Star regarding All Star's travel scams conducted in Puerto Rico. As a

16

result, All Star conspired with Defendant SBS to deceive residents of New York and New Jersey, both of which have large and growing Hispanic communities.

73.    Defendant SBS also violated federal rules applicable to all broadcast stations as it did not fully and accurately disclose the material terms of the radio contests, and did not conduct the contests substantially as announced or advertised. Defendant SBS's descriptions of the contests are false, misleading and deceptive with respect to material terms in violation of Federal Communications Commission rules and regulations, including but not limited to, 47 C.F.R. § 73.1216.

74.    As referred to above, no adequate notice has been provided to Plaintiffs, and no consent or bargained-for approval has been granted by Plaintiffs or other listeners who participated in the scam radio contest and were charged a $399 fee prior to being informed that airfare was not included in their purportedly free trip.  Nor do Defendants provide any notice, adequate notice or full disclosure of their unfair and deceptive scheme of charging a $399 fee for an "all inclusive" and "all expense paid" trip which does not include airfare.

Class Action Allegations

75.    Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class (the "Class") of: (a) all persons in the State of New York who have been charged a fee by Defendant All Star upon participating in scam radio contests aired by Defendant SBS's two New York radio stations, during the period from May 1, 2002, to the present; and (b) all persons in the State of New Jersey who have been charged a fee by Defendant All Star upon participating in scam radio contests aired by Defendant SBS's two New York radio

17

stations, during the period from May 1, 2002, to the present.

76.    Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants.

77.    This action is brought as a class action for the following reasons:

a.    The Class consists of thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.    There are questions of law or fact common to the Class that predominate over any questions affecting only individual members, including:

i.    whether Defendants defrauded all of the Class members through a common series of schemes in violation of 18 U.S.C. §§ 1961 et seq.;

ii.    whether Defendants' actions constitute violations of New York General Business Law § 349;

iii.    whether Defendants' actions constitute violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.;

iv.    whether Defendants are being unjustly enriched by, among other things, charging callers an "administrative" fee;

v.    whether members of the Class have sustained damages and, if so, the proper measure thereof; and

vi.    whether Defendants should be enjoined from the continued practices and policies with respect to the implementation of a scam radio

18

and travel contest; and

      vii.     whether Defendants should be enjoined from engaging in fake radio contests which are aired for the purpose of deceiving listeners to call Defendant All Star and pay a fee for a purportedly free trip which they are told they have won.

      c.    The claims asserted by Plaintiffs are typical of the claims of the members of the Class;

      d.    Plaintiffs will fairly and adequately protect the interests of the Class, and Plaintiffs have retained attorneys experienced in class and complex litigation, including related litigation involving consumer fraud;

      e.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

      i.     Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendants' violations of their legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendants will continue to retain their ill-gotten gains;

      ii.    It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

      iii.    When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

      iv.    A class action will permit an orderly and expeditious administration of Class claims, foster economies of time, effort, and expense and ensure uniformity of decisions; and

      v.     The lawsuit presents no difficulties that would impede its management by the Court as a class action.

      f.     Defendants have acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate; and

      g.     The prosecution of separate actions by individual members of the Class would create a risk of incompatible standards of conduct for Defendants and of inconsistent or varying adjudications for all parties.

78.     Defendants' violations of 18 U.S.C. §§ 1961 et seq. are applicable to all members of the Class, and Plaintiffs are entitled to have Defendants enjoined from engaging in a pattern of racketeering activity, and further enjoined from engaging in deceptive and unconscionable conduct in the future.

## FIRST CAUSE OF ACTION
### (Violation of N.Y. General Business Law § 349)

79.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 78 above as if fully set forth herein.

80.     Through their conduct described above, Defendants have engaged in deceptive acts and practices which resulted in injury to Plaintiffs and the other members of the Class.

81.     By reason of the foregoing, Defendants have violated N.Y. Gen. Bus. Law § 349, and are liable to Plaintiffs and the other members of the Class for the damages that they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## SECOND CAUSE OF ACTION
(Violation of New Jersey Consumer Fraud Act, N.J.S.A. 56: 8 -1 et seq.)

82.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1

through 81 above as if fully set forth herein.

83.     The Consumer Fraud Act prohibits, inter alia:

> The notification to any person by any means, as a part of an advertising
> plan or scheme, that he has won any prize and requiring him to do any act,
> purchase any other item or submit to a sales promotion effort is an
> unlawful practice and a violation of the act to which this act is a
> supplement.

N.J.S.A. 56:8-2.3.

84.     Defendant All Star, in its capacity as marketer, advertiser, promoter, and

seller of purportedly free trips, and Defendant SBS as the developer and implementor

of practices relating to the airing of scam radio contests offering listeners these

purportedly free trips, are each a "person" as defined in the Consumer Fraud Act.

N.J.S.A. § 56:8-1(d).

85.     Defendants' misrepresentations and false, deceptive and misleading

statements with respect to the scam radio contests and listeners winning purportedly

free trips and other prizes, as described above, constitute affirmative

misrepresentations and concealment and omissions of material fact, and are part of a

plan or scheme which constitute an unlawful practice in violation of the Consumer

Fraud Act.

86.     Defendants' false, deceptive and misleading statements regarding the

radio contests and imposition of "administrative" fees for purportedly free trips "won" in

scam radio contests would have been material to any potential listener's decision to call

21

the phone number being given out over the radio and pay fees for "free" trips which did not include airfare.

87. Moreover, Defendants made such false, deceptive and misleading statements, and concealed material information, about the purportedly free trips to be won, with the intent that others rely upon such statements and not become aware of the concealed information, such as, among other things, "administrative" fees and the cost of airfare. Thus, Defendants violated the Consumer Fraud Act because they engaged in radio contests which were illegitimate, and the trips "won" by contest participants were not pure gifts and did not come to the recipients without strings attached.

88. Plaintiffs and the other members of the Class tendered payment to Defendants in the form of "administrative" fees for "free" trips for their own personal use and suffered ascertainable loss as a direct and proximate result of Defendants' actions in violation of the Consumer Fraud Act.

89. As a consequence of Defendants' wrongful actions, Plaintiffs and the other members of the Class suffered an ascertainable loss of monies, including, but not necessarily limited to, the imposition of fees assessed by Defendant All Star for purportedly free trips which did not include airfare, the amount of such loss to be determined at trial.

90. Moreover, as Defendant SBS violated various federal rules and regulations applicable to broadcast stations, including but not limited to, 47 C.F.R. § 73.1216, its actions as described above constitute a *per se* violation of the Consumer Fraud Act.

91. By reason of the foregoing, Defendants are liable to Plaintiffs and the

22

other members of the Class for trebled compensatory damages -- including, but not limited to, payment of a sum equal to treble the amount of a refund of all monies acquired by reason of Defendant All Star's imposition of "administrative" fees -- plus reasonable attorneys' fees, filing fees and reasonable costs of suit, pursuant to N.J.S.A. 56:8-2.11, 8-2.12, 8-19.

### THIRD CAUSE OF ACTION
(Unjust Enrichment)

92.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 91 above as if fully set forth herein.

93.    By engaging in the conduct described above, Defendants have unjustly enriched themselves at the expense of Plaintiffs and the other members of the Class and are required, in equity and good conscience, to compensate Plaintiffs and the Class for damages suffered as a result of Defendants' actions.

94.    By reason of the foregoing, Defendants are liable to Plaintiffs and the other members of the Class for damages incurred as a result of Defendants' actions, the amount of such damages to be determined at trial.

### FOURTH CAUSE OF ACTION
(Common Law Fraud)

95.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 94 above as if fully set forth herein.

96.    Defendants intentionally misrepresented the legitimacy of the radio contests, and the fact that all listeners calling in were automatically designated "winners" of an "all inclusive" and "all expense paid" trip to a destination of their choice.

23

Moreover, Defendants failed to disclose and omitted the fact that all "winners" would be charged a $399.00 fee and that the cost of airfare was not included.

97.     Defendants knew that their misrepresentations and omissions of material fact about the "all expense paid" trips were false and misleading at the time that Defendants made them, and Defendants intended that listeners and contest participants rely upon such false and misleading representations.

98.     Plaintiffs and the other members of the Class relied, reasonably, justifiably, and in good faith, on Defendants' misrepresentations and omissions of material facts, including Defendants' intentional failure to disclose that certain "administrative" fees and "taxes," and the cost of airfare, were not included in the "all inclusive" and "all expense paid" trips. Defendants further omitted the fact that the radio contests were a scam and that all listeners calling in were "winners." Had they known of the falsity of such omissions and misrepresentations, and the true facts about the scam radio contests, Plaintiffs and the Class would not have participated in the radio contest and paid "administrative" fees or "taxes" and airfare for their purportedly free trips.

99.     Defendants had actual knowledge of the falsity of the material misstatements and omissions as set forth above and intended thereby to deceive Plaintiffs and the Class.

100.    As a consequence of the foregoing, Defendants are liable to Plaintiffs and the other members of the Class for the damages incurred as a result of Defendants' actions, including, but not necessarily limited to, any fees paid to Defendant All Star, including the cost of airfare incurred by members of the Class if they

24

traveled to their chosen destination, the amount of such damages to be determined at trial.

### FIFTH CAUSE OF ACTION
(Civil RICO)

101.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 100 above as if fully set forth herein.

102.    This cause of action is brought under the provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO").

103.    Defendant SBS and Defendant All Star each constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Defendant SBS is a "person" and Defendant All Star is a "person" within the meaning of 18 U.S.C. § 1961(3).

104.    In violation of 18 U.S.C. § 1962(a), both Defendant SBS and Defendant All Star received income directly from the pattern of racketeering activity and used the income or its proceeds for their own operation and for themselves. Defendant SBS conspired with Defendant All Star to violate the provisions of 18 U.S.C. § 1962(a), and that conspiracy by Defendant SBS violated 18 U.S.C. § 1962(d). Defendant All Star also conspired with Defendant SBS to violate the provisions 18 U.S.C. § 1962(a), and that conspiracy by Defendant All Star violated 18 U.S.C. § 1962(d).

105.    Defendant SBS and Defendant All Star are or were enterprises engaged in commerce, and, in violation of 18 U.S.C. § 1962(b), the enterprises and patterns of racketeering activity directly affected interstate commerce,

106.    In particular, Defendants conducted or participated in the conduct of the affairs of the enterprises through a pattern of predicate acts of mail fraud and wire fraud

25

and conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1962(c), and conspired to violate Section 1962(c), in violation of 18 U.S.C. § 1962(d).

107.    Defendants engaged, during the airing of the scam radio contest on April 13, 2008, and May 2, 2008, and on information and belief during a significant period of time prior thereto, in a continuing series of schemes to defraud Plaintiffs and the Class by depriving them of their monies through an array of improper devices, including but not limited to, the airing of scam contests and the mailing of invoices reflecting improper charges for undisclosed "administrative" fees for the purportedly free trips won.

108.    Defendants executed this scheme and artifice to defraud by causing matters to be mailed and sounds to be transmitted by means of wire communications in interstate commerce. Defendants committed, among many others, acts of mail fraud, indictable under 18 U.S.C. § 1341, and wire fraud, indictable under 18 U.S.C. § 1343, each of which constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), and all of which collectively constituted part of a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

109.    Continuously during the period since Plaintiffs first heard Defendant SBS's scam radio contest, on April 13, 2008, and May 2, 2008, Defendant SBS and Defendant All Star have engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), including many acts indictable under 18 U.S.C. § 1341 and 18 U.S.C. § 1343. Defendant SBS and Defendant All Star devised and engaged in a series of schemes and artifices to defraud, and, for the purpose of executing such schemes and artifices to defraud, Defendant SBS and Defendant All Star caused

26

matters to be mailed and delivered by the U.S. Postal Service. In addition, for the purposes of executing such schemes and artifices to defraud, Defendant SBS and Defendant All Star caused sounds to be transmitted by means of wire communications in interstate commerce.

110.    As a consequence of the foregoing, Defendants are liable to Plaintiffs and the other members of the Class for the damages incurred as a result of Defendants' actions, including, but not necessarily limited to, any fees paid to Defendant All Star, including the cost of airfare incurred by members of the class if they traveled to their chosen destination, the amount of such damages to be determined at trial, plus treble damages, reasonable attorney's fees, expenses and costs pursuant to 18 U.S.C. § 1964(c).

## SIXTH CAUSE OF ACTION
(Injunctive Relief)

111.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 110 above as if fully set forth herein.

112.    Given Defendants' wrongful actions as set forth above, which are ongoing and continuing to deceive and harm Plaintiffs, members of the Class and the general public, the Court should a) preliminarily and permanently enjoin Defendant SBS from continuing its practice of airing fake radio contests in order to deceive listeners into calling Defendant All Star so as to be charged an "administrative" fee or "taxes" for a "free" trip which does not include airfare; b) order Defendants to disgorge all profits earned in connection with the improper and impermissible expropriation of fees through the policy and practice of staging and airing fake radio contests for the purpose of

27

deceiving listeners to pay a fee for a "free" trip which does not include the cost of airfare; and c) immediately to take all steps necessary to disclose to Defendant SBS's current listeners its policy of airing fake radio contests for the purpose of deceiving listeners into calling Defendant All Star.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

1.   Certifying this action as a class action, with two sub-classes as defined above;

2.   On Plaintiffs' First Cause of Action, awarding against Defendants the damages that Plaintiffs and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus attorneys' fees;

3.   On Plaintiffs' Second Cause of Action, awarding against Defendants the damages that Plaintiffs and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus attorneys' fees, treble damages, expenses and costs;

4.   On Plaintiffs' Third Cause of Action, awarding against Defendants the damages that Plaintiffs and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial;

5.   On Plaintiffs' Fourth Cause of Action, awarding against Defendants the damages that Plaintiffs and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial;

6.   On Plaintiffs' Fifth Cause of Action, awarding against Defendants the

28

damages that Plaintiffs and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus treble damages, reasonable attorneys' fees, expenses and costs pursuant to 18 U.S.C. § 1964(c);

7.    On Plaintiffs' Sixth Cause of Action, a) declaring that Defendant SBS's practice of airing fake radio contests is misleading, deceptive and improper, b) preliminarily and permanently enjoining Defendant SBS from continuing its deceptive policies relating to the practice of staging and airing fake radio contests in order to induce its listeners into calling Defendant All Star and paying an "administrative" fee or "taxes" for their "free" trip, which does not include the cost of airfare; c) ordering Defendants to disgorge all profits earned in connection with the improper and impermissible expropriation of "administrative" fees through their policy and practice of staging and airing fake radio contests and inducing the "winners" of the radio contests into calling Defendant All Star and paying an "administrative" fee or "taxes" for their "free" trip, which does not include the cost of airfare; and d) ordering Defendant SBS to take immediately all steps reasonably necessary to disclose to its listeners its policy of airing fake radio contests;

8.    Awarding Plaintiffs interest, costs and attorneys' fees; and

9.    Awarding Plaintiffs such other and further relief as this Court deems just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38 of the Fed.R.Civ.P., Plaintiffs hereby demand a trial by jury.

29

Dated:     White Plains, New York
            May 21, 2008

                                   MEISELMAN, DENLEA, PACKMAN,
                                   CARTON & EBERZ P.C.

                  By:                            

                                   Jeffrey I. Carton (JC8296)
                                   Jerome Noll (JN7542)
                                   1311 Mamaroneck Avenue
                                   White Plains, New York 10605
                                   (914) 517-5000

                                   Attorneys for Plaintiffs

207727.WPD

## VERIFICATION

STATE OF NEW YORK            )
                            ) ss:
COUNTY OF NEW YORK          )

I, GABRIELA CARMONA, state that I have read the annexed First Amended Verified

Class Action Complaint, know the contents thereof and the same are true to the best of my

knowledge and information, except those matters therein which are stated to be alleged on

information and belief, and as to those matters I believe them to be true.

I affirm that the foregoing statements are true under penalty of perjury.

Dated:        New York, New York
              May 21, 2008

                                                Gabriela Carmona

## VERIFICATION

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF NEW YORK         )

I, EDNA SEPULVEDA, state that I have read the annexed First Amended Verified

Class Action Complaint, know the contents thereof and the same are true to the best of my

knowledge and information, except those matters therein which are stated to be alleged on

Information and belief, and as to those matters I believe them to be true.

I affirm that the foregoing statements are true under penalty of perjury.


Dated:        New York, New York
              May 21, 2008


                                                    _____
                                                    Edna Sepulveda